UNITED STATES of America ex rel.
Lorenzo RICHARDSON

v.

Alfred T. RUNDLE, Superintendent, State
Correctional Institution, Graterford,
Pennsylvania,

Mark Sendrow, Assistant District Attorney, as representative of the Office of the District Attorney of Philadelphia, Appellant.

No. 71-1506.

United States Court of Appeals,
Third Circuit.

Argued May 1, 1972.

Decided June 8, 1972.

James D. Crawford, Deputy Dist. Atty., Philadelphia, Pa., for appellant.

Joseph A. Torregrossa, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellee.

Before VAN DUSEN, GIBBONS and JAMES ROSEN, Circuit Judges.

OPINION OF THE COURT

GIBBONS, Circuit Judge.

The respondent warden, represented by the Philadelphia District Attorney, appeals the order of the district court granting a writ of habeas corpus. The writ was granted on the ground that evidence, consisting of a holster and a cartridge, admitted in evidence in the petitioner's state court trial, had been illegally obtained. The holster and cartridge were discovered during an on the street frisk after petitioner was stopped by a police officer. The district court held that the evidence was the fruit of an illegal search rather than of a frisk justified under Terry v. Ohio, 392 U.S. 1,

88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). United States ex rel. Richardson v. Rundle, 325 F.Supp. 1262 (1971). We reverse.

In the hearing on the habeas corpus petition the petitioner rested on the state court record. That record contains testimony by the arresting officer, Meehan. On the evening of February 18, 1963 at about 9:45 p. m. Officer Penko and he were on duty in a City of Philadelphia emergency patrol wagon. These were at that time red vehicles marked with a conspicuous POLICE sign. Officer Meehan testified as follows (28–34a):

"BY MR. BOGDANOFF [Attorney for the Commonwealth]:

\*   \*   \*   \*   \*   \*

Q. Now, could you tell us what happened approximately a quarter of ten or so that evening?

A. Yes. Officer Penko and myself were travelling east on Tioga Street. When we were between Sydenham and 15th Street we observed four unknown colored boys flee from the area of the drug store on the southwest corner of 15th and Tioga.

BY THE COURT:

\*   \*   \*   \*   \*   \*

Q. Flee from the drug store?

A. Yes, sir. That is, they were fleeing from the outside of the drug store. We didn't see any of them flee from the inside.

BY MR. BOGDANOFF:

Q. In other words, the first time that you picked up view of them, nobody was actually in the drug store?

A. There were four boys fleeing from the drug store, running west on Tioga towards Sydenham.

Q. Let's see if we can get this down a little finer. You say fleeing from. How far was the closest of the four from the front of the drug store when you first saw them?

A. A matter of a few feet. There is like—I think there are three steps, like a smaller step and a larger step and then another step. And they seemed to be on one—they seemed to be on one of those steps running from the store.

Q. It is my understanding that in order to get into the store you have to go up a series of three steps?

A. Yes, sir.

Q. And one or more of those young men you saw were on those steps?

A. Yes. They were all in a group, all running in the same direction.

Q. And when you saw them were they facing toward the drug store or away from it?

A. They were running west on Tioga which would be away from the drug store.

Q. Now, you said you saw four young men?

A. Yes.

Q. Do you see—at that time did you recognize any of the four young men?

A. At that time, no.

Q. What did you do, sir?

A. Well, they seemed to be similarly dressed. That is, they had like iridescent type raincoats that were dark. They had dark what is described as Pork Pie hat, and they all fled west on Tioga and south on Sydenham. We were travelling east on Tioga so they were running towards us.

Q. Now, they were running—did they then run past you?

A. Yes.

Q. And what did you do?

A. Backed up the wagon up to Sydenham and they were fleeing south on Sydenham. And we proceeded south on Sydenham and they cut through an alleyway that leads from Sydenham back to 15th Street.

Q. I see. And, of course, you couldn't go through the alley?

A. No.

Q. So what did you do?

A. We continued south on Sydenham.

Q. And then what happened?

A. To 15th and Ontario where we observed the boys again.

Q. The same four boys?

A. Well, they were wearing the same type clothing as the four we were chasing.

Q. At this time when you saw them the second time were they running or standing still?

A. They were huddled at the southwest corner of 15th and Ontario which is a block from the scene.

Q. Right?

A. As the wagon approached them three of them started to flee south on 15th and one went west on Ontario. I jumped from the wagon and grabbed the defendant that is seated here, Lorenzo Richardson which was the one that was going west on Ontario.

Q. Now, how far had he proceeded away from where the group had gathered before you caught him?

A. I would say a matter of five or seven feet, something like that.

Q. Then you jumped out of the wagon, and what did your partner do, if you know?

A. He was driving. I was the recorder. He proceeded south on 15th Street.

Q. He was after the other three?

A. Yes.

Q. Incidentally, the other three were not caught?

A. No.

Q. You stopped the defendant, is that right?

A. Yes.

Q. Who spoke first, if you remember?

A. I grabbed the defendant. As I did I walked him back down 15th Street, south on 15th Street.

Q. Right. Then what happened? First of all, when you grabbed ahold of the defendant did you say anything to him?

A. I don't believe I did, but he was saying something about he didn't do anything. What is all this. I don't believe I told him why I grabbed him or any such thing as that. I just had him by the arm and walked him south on 15th Street.

Q. Now, you walked him south on 15th Street and then what happened?

A. About midway down Officer Penko had stopped the wagon on 15th Street in the center—in the traffic lane. On 15th Street cars are parked on both sides leaving only one travelling lane. He had the wagon parked about midway down 15th Street right in the middle of the street.

Q. And what did you do with the defendant?

A. Walked him down to the wagon where he was met by Officer Penko. I placed the defendant up against the wagon with his hands on the wagon and his feet outstretched and proceeded to frisk him."

As a result of the frisk the holster and cartridge were found. Immediately thereafter a woman brought to the officer a gun which she said had been dropped by one of the four boys.

Officer Penko testified as follows (83–85a):

"Q. On that evening approximately 10 o'clock where were you?

A. I was the operator of 3900 emergency patrol wagon, and I was driving east on Tioga Street approaching 15th Street.

Q. And what did you see there?

A. I observed four colored boys running from the steps of the drug store located on the southwest corner of 15th and Tioga. They were running west on Tioga Street. I put the wagon in reverse and backed up, and I again saw them running south on Sydenham Street and enter an alley which goes from Sydenham Street back to 15th Street. I turned the wagon south on Sydenham Street. Opposite

the alley I looked down at the alley and they were about almost all the way through the alley. I continued south on Sydenham Street to the next corner which was Sydenham and Ontario. They were together—four colored boys were together on the southwest corner of 15th and Ontario Streets.

Q. Were they the same boys or different boys?

A. Looked like the same boys wearing the same clothing.

\* \* \* \* \* \*

A. . . . When I approached them with the wagon three of them ran south on 15th Street and one ran west on Ontario Street. My partner jumped out of the wagon to go after the one that was running west on Ontario Street, and I proceeded after the three going south on 15th Street.

Q. Of course, you did not catch those three?

A. No, I did not.

Q. After you made your attempt to catch those three what did you do?

A. I parked the wagon about half way down the block on 15th Street and proceeded after them on foot and lost them. I went back to the wagon and Officer Meehan was coming south on 15th Street with the defendant. When he got to the wagon he frisked the defendant and found the black leather holster in his right hand pocket and also the .22 caliber bullet."

The officers took the petitioner back to the drug store, where he was identified by the proprietor as one of the persons who had robbed him shortly before. Petitioner was convicted of the robbery.

It is at least questionable whether on such a state court record there was a sufficient Terry v. Ohio issue to warrant an evidentiary hearing. *See* Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed. 2d 770 (1963); 28 U.S.C. § 2254(d) (8). But in any event such a hearing was held. The Commonwealth produced Officer Penko, who supplemented the state court record. His testimony establishes that the area was in a high crime district, and that the officers were always on the lookout for robberies of business establishments. When they first observed the four young men the officers were on their way to the drug store for the specific purpose of signing a log in the store. The stores in the neighborhood maintained such logs because the police were required to check those locations at regular intervals to guard against robberies. Robberies usually took place around the time the store opened and around closing time, which was 10 P.M. When he saw the young men fleeing from the drug store he concluded a crime was either being perpetrated or about to be perpetrated.

The district court states:

"In the instant case, I am satisfied that the police officers, based upon their knowledge and experience, had reason to conclude that criminal activity might be afoot when they observed the four youths running from the steps of the drug store around closing time. Further investigation was proper under the circumstances. Beyond that, the burden was on the Commonwealth to establish that the police had reason to believe that Richardson, assuming he was one of those youths, was armed and dangerous. The record is barren of any facts from which Officer Meehan could reasonably have inferred that his safety or the safety of others was in danger."

325 F.Supp. at 1264. (footnote omitted).

We disagree. As the district court points out, there was ample reason for a *Terry* type street inquiry, since there was reason to believe criminal activity was afoot. The criminal activity in question probably was robbery. *Compare* Sibron v. New York (appeal of Sibron), 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1966). Unless one were to believe that Philadelphia robbers usually accomplished their ends by blandishment rather than by the use of weapons one must conclude that the officer could reason-

ably infer petitioner might be armed. Such a reasonable suspicion justifies a *Terry* frisk.

■ In Sibron v. New York (appeal of Peters), *supra*, at 66, 88 S.Ct. at 1904 the court points out that " . . . deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of the officer relating the suspect to evidence of crime, they are proper factors to be considered in the decision to make an arrest." Peters' frisk was justified as incident to a lawful arrest rather than as incident to a *Terry* investigative stop, but the significance of furtive actions and flight is equally applicable to both situations. The officers observed four young men fleeing from the likely target of an armed robbery. The four eluded the plainly marked police car by running through an alley. The officers came upon four young men, believed to be the same four, on the next street. When the police car approached three fled in one direction and one in an opposite direction. Officer Meehan apprehended and frisked one.

The district court points out that Officer Meehan made no inquiries of the petitioner and gave him no opportunity to explain his conduct. In fact, however, Meehan testified that the petitioner immediately denied wrongdoing. The district court's holding would apparently require that the officer accept the denial at face value or engage in some sort of colloquy. When making inquiry of a suspected robber a frisk was more appropriate than a debate.

In United States v. Lindsey, 451 F.2d 701 (3d Cir. 1971) we considered the admissibility of heroin found during a frisk made by a United States Marshal at an airport investigative stop of a suspected hijacker. We concluded that defendant's conduct created a sufficient level of suspicion to justify an investigative stop. The belief that such person might be a hijacker justified a pat down when nothing in the preliminary inquiry dispelled this impression. Just as a suspected hijacker might be armed, so might a suspected robber. The spontaneous denial of wrongdoing when the petitioner was apprehended in flight from the officer did nothing to dispel the impression that he might be an armed robber. *See, e. g.* United States v. Berryhill, 445 F.2d 1189, 1193 (9th Cir. 1971); United States v. Marshall, 142 U.S.App.D.C. 167, 440 F.2d 195, cert. denied, 400 U.S. 909, 91 S.Ct. 153, 27 L.Ed.2d 148 (1970); Ballou v. Massachusetts, 403 F.2d 982 (1st Cir. 1968), cert. denied, 394 U.S. 909, 89 S.Ct. 1024, 22 L.Ed.2d 222 (1969). *Compare* Sibron v. New York, (appeal of Sibron), *supra*, and United States v. Davis, 441 F.2d 28 (9th Cir. 1970), both invalidating a frisk of person suspected of non-violent criminal activity, *with* the cases cited immediately above. *Cf.* Williams v. Adams, 441 F. 2d 394 (2d Cir. 1971), cert. granted, 404 U.S. 1014, 92 S.Ct. 670, 30 L.Ed.2d 661 (1972), argued, 11 Crim.L.Bull. 4030 (Mar. 10, 1972).

■ Thus we conclude that the evidence obtained as a result of the frisk by Officer Meehan was admissible under Terry v. Ohio, *supra*, and that the reason for which the writ of habeas corpus was issued is not supported in the record.

■ The petitioner also presented a contention that his in-court identification by the victim of the robbery was the result of an impermissibly suggestive show up. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The district court declined to reach this issue, which on the state court record is certainly not frivolous, on the ground that petitioner has not exhausted his state court remedies in that respect. In this posture we would ordinarily merely reverse the judgment of the district court and leave the petitioner to the pursuit of further relief under the Pennsylvania Post Conviction Hearing Act, Pa.Stat.Ann. Tit. 19 § 1180–1 et seq. (Purdon's Supp.1971). But there are exceptional circumstances in this case which warrant the relaxation of the rule of comity laid down in 28 U.S.C. § 2254 (b). United States ex rel. Gockley v.

Myers, 411 F.2d 216 (3d Cir.), cert. denied, 396 U.S. 847, 90 S.Ct. 96, 24 L.Ed. 2d 96 (1969). Since the district court issued the writ of habeas corpus the petitioner has been free from custody. He faces a remaining sentence of two and one half to ten years. We think it is appropriate for the district court, having taken jurisdiction over the issue of constitutionality of petitioner's confinement, and having interrupted service of his sentence, to resolve the Stovall v. Denno issue without requiring petitioner to exhaust the Pennsylvania post conviction remedy. On remand the district court may consider whether pending the further disposition of the petition it should continue the petitioner's enlargement on bail. *See* Johnston v. Marsh, 227 F.2d 528 (3d Cir. 1955).

The judgment of the district court will be reversed and the case remanded for further proceedings consistent with this opinion. The mandate of this court shall issue forthwith.