**UNITED STATES of America**

v.

**Terry L. EMBRY, Appellant.**

**No. 76–1592.**

United States Court of Appeals, Third Circuit.

Argued Oct. 19, 1976.

Decided Dec. 2, 1976.

Larry P. Gaitens, Lucchino, Gaitens & Hough, Pittsburgh, Pa., for appellant.

Blair A. Griffith, U. S. Atty., Judith K. Giltenboth, Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

Before SEITZ, Chief Judge, and HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

PER CURIAM.

This appeal requires us to determine whether the District Court erred in refusing to suppress certain evidence admitted at the appellant Embry's trial. Our determination depends upon the lawfulness of the police pursuit of Embry, and Embry's arrest and subsequent "search" after he fled from the presence of the police who were conducting a street frisk (of another person). We agree with the District Court that, under the stipulated facts, the evidence (heroin) was properly admitted at trial.

I

All of the facts on which Embry was convicted and which give rise to this appeal were stipulated by Embry, his counsel and the government.[1] The stipulation, in pertinent part, follows:

.    .    .    .    .

2. If called to testify, Inspector William A. Moore, Officer in Charge of the Number Two Precinct for the City of Pittsburgh Police Department, would testify:

(a) That on Wednesday, October 1, 1975, at approximately 8:30 A.M. he received a telephone call from a personal friend who was the principle (sic) of a local elementary school. That during the course of this telephone call he was advised that a large crowd was gathered in the area of Jerry's Bar, Centre and Roberts Streets, Pittsburgh, Pennsylvania, and the school children were having diffi-

culty getting to the elementary school. That pursuant to this telephone call he personally ordered police vehicles to disperse a crowd in the area of Jerry's Bar, Centre and Roberts Streets, Pittsburgh, Pennsylvania. That this area is known to him, based on his experience as a police officer, to be a high crime area.

3. If called to testify, Sergeant Harry Miller, Pittsburgh Police Department, Pittsburgh, Pennsylvania, would testify that:

(a) On Wednesday, October 1, 1975, at approximately 8:30 A.M. he was on duty with Officer James Diskin. That while in a police vehicle, he and Officer Diskin responded to a police dispatch instructing them to disperse a crowd at Jerry's Bar, Centre and Roberts Streets, Pittsburgh, Pennsylvania. That at approximately 8:40 A.M. he and Officer Diskin arrived at the locale and observed three males crossing Centre and two males remaining outside the Bar.

(b) That at approximately 8:45 A.M. he exited the vehicle to question one of the two male adults, who he believed to be George Brooks, a robbery suspect. That he grabbed the individual he believed to be Brooks and said loudly "Lets see what you have". That he began to "pat down" of Brooks' person. That immediately the other male began to run from the scene. The other male was later identified as the defendant Terry L. Embry.

(c) That he, assisted by Officer Diskin, immediately pursued the defendant Embry on foot. That he chased Embry to a vacant lot at the rear of 86 Arthur Street, a total distance of several city blocks. That as he chased Embry into the aforementioned vacant lot he observed Embry bring his right hand toward a jacket that he was wearing, and throw with his right hand what appeared to be a rolled shaped ball of aluminum foil to the ground. That he observed the

---

1. In addition, we have examined the uncontradicted testimony of Officer Miller who testified at the suppression hearing.

defendant Embry after discarding the aforedescribed object fall to the ground in heavy weeds and attempt to hide from he and Officer Diskin and that he went to retrieve the package while Officer Diskin handcuffed the defendant and he retrieved the object he had observed the defendant Embry had thrown to the ground and discovered that it was a plastic bag containing a large number of silver foil packets of suspected heroin. That he and Officer Diskin at approximately 8:50 A.M. arrested the defendant Embry. That he retrieved the plastic bag containing the silver foil packets of heroin approximately four feet from where the defendant Embry was hiding and apprehended. That he observed no other individuals in the location of defendant Embry's arrest and seizure of the heroin. That the weather was clear during the early morning of October 1, 1975.

(d) That he, assisted by Officer Diskin, searched the defendant Embry incident to the arrest and found on his person, $160.00 in United States Federal Reserve Notes, most of it gathered in $22.00 folds. That he maintained custody of the evidence and assisted by Officer Diskin transported Embry to the Number Two Pittsburgh Police Precinct.

(e) That he, while at the Number Two Police Station, processed the evidence, witnessed by Officer Diskin. That he determined that the plastic bag contained 92 approximately ¼ inch by 1½ inches square packets of heroin, a brown speckled powder. That he then placed and sealed the plastic bag of the 92 "half spoonful" quantity of heroin inside a Pittsburgh Police envelope and identified it according to normal police procedures. That he maintained the $160.00 as evidence according to usual police procedures. That he surrendered custody of the evidence to Officer Diskin for the purpose of transporting the evidence to the Pittsburgh and Allegheny County Crime Laboratory.

(f) That based on his experience as a police officer in the City of Pittsburgh and on October 1, 1975, the going street price for a packet or "half spoon" of heroin was twenty-two to twenty-seven dollars. That based on his experience as a police officer in the City of Pittsburgh and on October 1, 1975, the aforementioned 92 "half spoons" of heroin was packaged in the manner commonly utilized in the illegal street distribution of drugs.

.     .     .     .     .

■ Although Embry had been apprehended by the Pittsburgh (City) police and had initially been charged with a narcotics violation by the Commonwealth, that charge was dismissed and Embry was never prosecuted by the Commonwealth for other than the summary offense of traffic obstruction.[2] The dismissal of the Commonwealth charges occurred after Embry had been indicted on October 9, 1975 by a federal grand jury for possessing "with intent to distribute approximately 27.051 grams of heroin in violation of § 841(a)(1) of Title 21, U.S. Code." Thereafter, Embry moved before the District Court for the Western District of Pennsylvania to suppress "The items confiscated and set forth in the *Criminal Complaint*"[3] (sic) (emphasis added), charging that those items had been confiscated without a valid search warrant, that they were not in possession of the defendant, and that they were seized pursuant to an illegal arrest.

After a hearing, the District Court Judge denied Embry's motion to suppress the heroin which had been seized by the police. A memorandum opinion was filed. In that memorandum, the District Court properly held that the federal court was not bound by the Pennsylvania Supreme Court deci-

2. Embry also contends that the District Court erred in permitting the federal prosecution to proceed after the state charge for the same offense had been dismissed. We have considered this claim and find it to be without merit.

3. The Criminal Complaint accused Embry of possessing with intent to deliver 92 half spoons of heroin and with obstructing traffic.

sion in *Commonwealth of Pennsylvania v. Jeffries,* 454 Pa. 320, 311 A.2d 914 (1973). The District Court also held that the heroin, having been discarded by Embry, was in "plain view" and was therefore subject to seizure by the police.

Embry, relying principally on *Commonwealth v. Jeffries, supra,* argues that "under all the circumstances known to the police officers at the time appellant began to flee from the scene, the police officers lacked sufficient justification, under prevailing constitutional standards, to pursue and undertake a search of appellant." (Appellant's Brief page 7).

Essentially Embry contends that the initial pursuit was unlawful and that, therefore, every action that followed (arrest, "search," seizure of heroin) necessarily was also unlawful.[4] We do not agree.

## II

We believe that this is an appropriate case in which to note the Supreme Court's observation:

.   .   .   The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.

*Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) the Supreme Court adopted an objective standard to determine the reasonableness of a stop and frisk. The Court stated:

.   .   .   The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. (citations omitted). And in determining whether the officer acted reasonably in

such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Id.* at 27, 88 S.Ct. at 1883.

Discussing *Terry* in *Adams v. Williams, supra,* the Court said:

.   .   .   a brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

407 U.S. at 146, 92 S.Ct. at 1923.

This Court, relying on *Terry v. Ohio, supra* and refering to *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1966), previously approved police pursuit where furtive actions and flight were involved. *United States ex rel. Richardson v. Rundle,* 461 F.2d 860 (3d Cir. 1972), *cert. denied* 410 U.S. 911, 93 S.Ct. 971, 35 L.Ed.2d 273 (1973). In *Richardson,* while on patrol in a high crime area, police observed four men running from the front of a drugstore near closing time. One of the four (Richardson) was pursued and apprehended. A holster and bullet were found when police conducted a pat down. Holding that the evidence obtained was admissible, this court noted that the area was a high crime district and that robberies often occurred at that hour. Comparing a search incident to an arrest with a *Terry* investigative stop, Judge Gibbons, writing for the court, said, " .   .   .   the significance of furtive actions and flight is equally applicable to both situations." *Id.* at 864. The court concluded that there was ample reason for a *Terry* type inquiry, " .   .   .   since there was reason to believe criminal activity was afoot. The criminal activity in question probably was robbery." *Id.* at 863.

A similar rationale was recently expressed in *Robinson v. United States,* 355 A.2d 567 (D.C. Ct.App.1976). In *Robinson,* a police officer received a report of a man

---

4.   *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

exposing himself. When the officer later saw an individual who generally fit the description of the suspect and who was in the area where the offense occurred, he pursued and forcibly stopped him. Affirming appellant's conviction for unlawful possession of a gun, that court found that the pursuit and stop, although on less than probable cause, came within the parameters of *Terry.*

Embry, however, relies on *Commonwealth of Pennsylvania v. Jeffries, supra.* In *Jeffries,* police observed defendant walking along the street. When Jeffries saw the officers, he quickened his pace and was pursued. As he ran, Jeffries threw a cigarette package under an automobile. He was stopped and subsequently arrested when the package was retrieved and found to contain heroin. Reversing his conviction, the Pennsylvania Supreme Court found that the defendant's quickened pace and flight *"absent some other factor"* which would give rise to suspicion of criminal conduct" was not enough to justify a *Terry* stop. 454 Pa. at 325, 311 A.2d at 917 (Emphasis added).

Even if we were to assume, *arguendo,* that *Jeffries* correctly interprets federal constitutional standards, *Jeffries* is not this case. Embry did not simply run at the sight of police officers as did Jeffries; he ran only after the police officer questioned and began to frisk the individual standing next to him, thus supplying the "other factor" to which *Jeffries* refers. It is this additional factor which constitutes a significant difference between *Jeffries* and Embry. We conclude that the police response to Embry's flight was justified. *Adams v. Williams, supra; Terry v. Ohio, supra; United States ex rel. Richardson v. Rundle, supra; see Edwards v. United States,* 364 A.2d 1209 (D.C. Ct.App.1976).

### III

Having concluded that the pursuit of Embry by Officers Miller and Diskin was per-

missible, we turn to the next event which took place—Embry's arrest.

It should be recalled that, after a foot chase of some several city blocks, Officer Miller observed Embry "bring his right hand toward a jacket that he was wearing, and throw with his right hand what appeared to be a rolled shaped ball of aluminum foil to the ground." (Stipulation 3(c), p. 553 *supra*) At the suppression hearing Officer Miller testified without contradiction that, based on his experience as a police officer, he had acquired familiarity with the method of packaging narcotics and that the usual packaging was in "folded aluminum foil.[5]

The validity of an arrest is determined by considering "whether, at the moment the arrest was made, the officer had probable cause to make it." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Here, Embry's flight was triggered by the street frisk of another person standing in close proximity to him. While fleeing, Embry discarded an aluminum foil package which Officer Miller recognized as the kind of packaging commonly employed in the narcotics trade. While, without more, the initial flight of Embry might not have afforded sufficient probable cause to justify his apprehension, Embry's action in discarding a package recognized as one in which narcotics are frequently transported, *see United States v. Martin,* 386 F.2d 213 (3d Cir. 1967), *cert. denied* 393 U.S. 862, 89 S.Ct. 142, 21 L.Ed.2d 130 (1968), more than satisfies the probable cause requirement for Embry's arrest. We conclude that the arrest was valid.

### IV

Having arrived at the conclusion that the pursuit of Embry was justified and that the arrest was valid, we are satisfied that the District Court did not err in refusing to suppress the evidence (heroin) retrieved by the two police officers.[6]

---

**5.** Transcript of Motion to Suppress Hearing at 13–14.

**6.** We observe that although Embry's argument before us is framed in terms of a search of his person, at no time did Embry move to suppress

"One who abandons personal property may not contest the constitutionality of its subsequent acquisition by the police." *United States v. DeLaRosa,* 450 F.2d 1057 (3d Cir. 1971), *cert. denied* 405 U.S. 957, 92 S.Ct. 1188, 31 L.Ed.2d 235 (1972). Whether we regard the controlling principle to be that of "abandonment" or "plain view," *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), as the District Court held, in either event the evidence was properly admitted and should not have been suppressed. The police conduct which induced Embry to rid himself of the aluminum foil package was not unconstitutional but rather good police work. We find no basis for excluding that evidence from Embry's trial.

V

The judgment of the District Court will be affirmed.

SEITZ, Chief Judge (dissenting).

Defendant, Embry, was convicted on the basis of evidence which, in a motion to suppress, he argued was illegally obtained in violation of the fourth amendment. Embry argued that at the time the officers pursued him they lacked reasonable cause to detain or frisk him, and that his ejectment of the heroin from his pocket as the officers closed in was not a voluntary abandonment, but was coerced by the illegal pursuit. I conclude that both arguments are well founded and, therefore, dissent.

An understanding of the procedural history of this case is important to a proper development of the facts relevant to this appeal. Defendant was charged with unlawful possession with intent to distribute a quantity of heroin. The government's case hinged upon the admissibility of the heroin which was the subject of a pretrial motion to suppress.[1] Thus, Embry was either clearly guilty or clearly not guilty of the charge depending upon the outcome of that motion. After a pretrial suppression hearing, which consisted of the live testimony of three police officers, the court denied the motion. One month later the parties entered into the stipulation which is reprinted in the majority opinion, the purpose of which was to expedite the determination of guilt without a jury and without a trial. The majority relies exclusively on this stipulation which was solely concerned with the narrow question of guilt or innocence on the evidence whose admissibility had already been determined. Inexplicably, the portion of the transcript of the suppression hearing concerning the events surrounding Embry's pursuit is wholly ignored by the majority. It is therefore necessary to summarize the testimony given at the hearing.

Officer Moore, who was stationed at headquarters, received numerous complaints concerning a large crowd gathered at Roberts Street and Centre Avenue that was making it difficult for children to reach the elementary school located a half-block away. One of the calls was from a personal friend who was the school principal.

Centre Avenue and Roberts Street form one of the main intersections in a high crime area of downtown Pittsburgh. There is heavy vehicular and pedestrian traffic at the intersection and a number of business establishments are located there which are open during early morning hours.

Moore dispatched a patrol car to the intersection to investigate, and, shortly before 8:30 a. m., personally drove by and observed the crowd. Moore gave no testimony concerning his observation, however, and no one testified concerning what transpired when the dispatched car arrived.

About 8:43–9:00 a. m., Officers Miller and Diskin, who had earlier overheard the dis-

any of the items which were discovered on him, *see* stipulation 3(d). Thus, as the issue was framed, we are left only with the question as to whether the heroin thrown away by Embry was properly admitted in evidence.

1. Of course, the officers' testimony concerning their observation of Embry discarding the heroin and anything found in a search incident to the arrest that followed must be suppressed as illegal fruits if the heroin itself is suppressible. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

patch from Moore to another car while cruising in the area, decided to investigate the intersection themselves. As the officers pulled up to the intersection, they observed five persons. Three men in front of Dickerson's Cleaners were proceeding east on Centre Avenue, and across the street, leaning against Jerry's Bar, were two men who were unknown to the officers. Diskin testified that though there was no crowd at the intersection, they stopped because the two men looked like drug pushers. This account was also contained in the official police report prepared by Diskin on the day of the arrest.

Upon alighting from the car, Miller accosted one of the men standing near Jerry's Bar and asked, "Do you have anything on you"?[2] When the man responded, "No," Miller nevertheless gave him a body frisk. At this point, Embry, who had been standing six feet away, began to run west on Centre Avenue. Both officers immediately left the other man and pursued Embry for several blocks into a vacant lot. Miller witnessed Embry take an aluminum packet from his jacket pocket and discard it in the weeds, and Diskin, though he had not seen this activity, immediately handcuffed Embry who was lying prone in the weeds.

## I

Once the officers began to pursue Embry, his liberty was restrained and he was thus "seized" within the meaning of the fourth amendment. *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Since it is not contended that the officers had probable cause to arrest Embry, the threshold question is whether at the time of the chase, an investigatory stop could nevertheless be effected consistently with the fourth amendment.

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967), the Court drew a carefully limited exception to the general requirement that probable cause must exist

before a forcible stop is permissible. The Court approved a brief investigatory stop and protective frisk when a " . . . police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity is afoot . . . ." 392 U.S. at 30, 88 S.Ct. at 1884. Because in *Terry* the seizure and frisk were virtually simultaneous, *Terry* expressly considered only the circumstances under which a limited protective frisk for weapons is permissible. Implicit in the Court's holding, however, is that the officer must have reasonable grounds to suspect that criminal activity is afoot before he forces the encounter which justifies the frisk. 392 U.S. at 32–34, 88 S.Ct. 1868 (Harlan, J., concurring). Subsequent decisions of the Supreme Court reveal the accuracy of Justice Harlan's explication of *Terry.*

*United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), was concerned exclusively with the legality of a brief investigatory stop. The Court held that responses to questions asked by a border patrol officer must be suppressed in an Immigration Act prosecution because at the time that the officer stopped the auto at a traffic checkpoint he had not observed facts which would make it reasonable to suspect that the vehicle contained aliens who had illegally entered the country. In *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Court held that an informant's report that a man sitting in a parked auto was carrying narcotics and had a gun at his waist carried sufficient indicia of reliability to justify an investigative stop. The Court noted that "[s]ome tips, completely lacking in indicia of reliability, would either warrant no police response or to require further investigation before a forcible stop of a suspect would be authorized." *Id.* at 147, 92 S.Ct. at 1924.

*Terry* and its progeny do not license the police to stop individuals in public places on a bare suspicion or an intuition that they

---

**2.** Officer Miller explained that by this statement he meant—do you have any weapons. Neither officer contended that the frisk was effected for protective purposes, however, and

there is simply no testimony which points to even a subjective belief that either man was armed or dangerous.

may be criminals, and it certainly does not permit random stops in an effort to turn something up. In every case, "the police officer must be able to point to specific and articulable facts which, taken together with reasonable inferences from those facts, reasonably warrant the intrusion." 392 U.S. at 21, 88 S.Ct. at 1880.

Thus, once there has been a motion to suppress, the police must come forward with credible testimony of specific facts to which a judge can apply an objective standard. *Id.* at 21–22 & n. 18, 88 S.Ct. 1868. The testimony offered at the hearing does not point to a single fact that would suggest that Embry may have committed or was about to commit a crime. We are pointed to the infraction of no law of the Commonwealth which the officers might have had reason to investigate. The fact that two men are leaning against a building at a busy intersection in broad daylight is hardly reason to believe that they are engaged in criminal activity. Indeed, according to their testimony, the officers' sole reason for stopping was because the men looked like drug pushers. Yet the officers failed to relate a single articulable fact which would justify a suspicion that the two men had violated the narcotics laws.

The majority nevertheless hold that Embry's flight is sufficient evidence of a crime in progress to justify an investigatory stop. We have held that furtive actions and flight are as significant to the existence of reasonable cause as it is to probable cause. *United States ex rel. Richardson v. Rundle,* 461 F.2d 860 (3d Cir. 1972), *cert. denied,* 410 U.S. 911, 93 S.Ct. 971, 35 L.Ed.2d 273 (1973). But no case has been cited, and none has been found, holding that running on a public street in broad daylight is sufficient without more to establish that the person *running* is a criminal. We noted in *Richardson* that flight is a proper factor to consider *"when coupled with specific knowledge on the part of the officer relating the suspect to evidence of crime. . . ."* 461 F.2d at 864 (emphasis added), *quoting Sibron v. New York,* 392 U.S. 40, 66–67, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1967).

The facts of *Richardson* demonstrate that which is missing here. In *Richardson,* at 10:00 p. m., the police witnessed four men fleeing from a drug store which had just closed in an area hard hit by robberies which usually occurred at closing time. These are articulable facts related by the officers which justified their belief that a robbery had been committed. Here, prior to the flight, the officers knew that Embry had merely been leaning against the building. Viewed objectively, what prompted his flight was not the desire to escape from the scene of a crime, but the desire to avoid being subjected to a forcible stop and frisk. *See United States v. Margeson,* 259 F.Supp. 256, 264–65 (E.D.Pa.1966); *Commonwealth v. Jeffries,* 454 Pa. 320, 311 A.2d 914, 916–17 (1973).

The majority hold that, assuming that running alone is insufficient, running only after witnessing another person being frisked supplies another fact from which it is reasonable to infer criminal conduct. With due respect, this reasoning stands the fourth amendment on its head. Had the police asked Embry to answer a few questions or to submit to a search, he could have answered "No," and walked away. 392 U.S. at 32–33, 88 S.Ct. 1868 (Harlan, J., concurring); *id.* at 34, 88 S.Ct. 1868 (White, J., concurring). Because he did not wait to be forcibly searched as had the man standing near him, but ran instead, we are told that it is reasonable to believe that Embry was engaging in criminal activity. The hidden assumption is that only a criminal would object to being frisked. By parity of reasoning, every refusal to consent to a search is sufficient cause to conduct the search without consent.

II

Having concluded that the pursuit of Embry was an unlawful seizure, it remains to be determined whether the heroin retrieved by the officers was the fruit of the seizure or whether it was abandoned property as the majority hold, or in "plain view" as the district court held. The law of this Circuit, as elsewhere, is that contraband thrown

into an unprotected area within the sight of police is nevertheless not voluntarily abandoned when the defendant's action is induced by illegal police activity. *E. g., United States v. Merritt,* 293 F.2d 742 (3d Cir. 1961); *Lawrence v. Henderson,* 478 F.2d 705 (5th Cir. 1973); *Fletcher v. Wainwright,* 399 F.2d 62 (5th Cir. 1968). In *Merritt* and *Fletcher* contraband was thrown from a window into an unprotected area after police had illegally entered the premises, and in *Lawrence,* the contraband was hidden in a police car following an illegal arrest. Similarly, *Commonwealth v. Jeffries,* 454 Pa. 320, 311 A.2d 914 (1973), held inadmissible heroin which was thrown on a public street as police illegally pursued the defendant on foot. Since Embry did not throw the heroin packet until after a chase of several blocks his capture was imminent, he did not voluntarily abandon it, and the heroin must, therefore, be suppressed.[3] The plain view doctrine is also inapplicable since it is axiomatic that the police must properly be in a position to have the view.

The only justification given for the ensuing arrest was observation by Officer Miller of the aluminum packet which he recognized as a typical heroin container. Absent this evidence, the officers lacked probable cause to make the arrest.

### III

Wholly apart from the foregoing discussion, the arrest was illegal because at the moment that the arrest was made the arresting officer lacked probable cause. To establish probable cause, the majority rely upon the testimony of Officer Miller concerning his familiarity with narcotics packaging and recognition of the package thrown by Embry as such a package. Had Officer Miller made the arrest this testimony would be relevant. However, Officer Diskin testified that he did not see Embry throw the package and that Miller did not apprise him of it until after he, Diskin, had

already begun handcuffing Embry. *Transcript of Suppression Hearing* at 30–32. The arrest occurred no later than the point at which Embry was handcuffed by Diskin, and at this point Diskin had seen or heard nothing but the running of Embry on a public street.

It seems to me that federal courts, above all, should be careful not to adopt the end justifies the means approach to law enforcement. Unless fourth amendment rights are implemented by the courts in unpopular cases, they will surely be compromised generally and our personal security and dignity sacrificed to that extent on the altar of expediency. I would reverse.

---

**3.** The prosecution's reliance upon *United States v. Martin,* 386 F.2d 213 (3d Cir. 1967) (per curiam), *cert. denied,* 393 U.S. 862, 89 S.Ct. 142, 21 L.Ed.2d 130 (1968), is misplaced. Unlike the situation before us in *Merritt, supra,* we found in *Martin* that the abandonment of narcotics was not induced by exploitation of the initial illegality which was not directed at defendant.