PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 08-4042

LARRY JOHNSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.
(1:07-cr-00153-RDB-1)

Argued: January 29, 2010

Decided: April 1, 2010

Before WILKINSON and AGEE, Circuit Judges, and
R. Bryan HARWELL, United States District Judge for the
District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Agee and Judge Harwell joined.

## COUNSEL

**ARGUED**: Sapna Mirchandani, OFFICE OF THE FED-
ERAL PUBLIC DEFENDER, Greenbelt, Maryland, for
Appellant. Tonya Kelly Kowitz, OFFICE OF THE UNITED

STATES ATTORNEY, Baltimore, Maryland, for Appellee.
**ON BRIEF:** James Wyda, Federal Public Defender, Baltimore, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Jonathan Biran, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

---

## OPINION

WILKINSON, Circuit Judge:

Larry Johnson appeals on Fourth Amendment grounds from his conviction on various drug and firearm charges. Police witnessed Johnson making what appeared to be a series of hand-to-hand exchanges with multiple people in a known open-air drug market. By this point, the facts known to the officers were at least sufficient to support a "reasonable suspicion" that Johnson was dealing drugs, justifying a brief investigatory detention under *Terry v. Ohio*, 392 U.S. 1 (1968). A police officer then approached Johnson and ordered him to show his hands. When Johnson responded by attempting in front of the officer to toss a heroin gelcap out of sight, reasonable suspicion ripened into probable cause to arrest. And when police later learned that Johnson had been back and forth to a nearby car just before the series of hand-to-hand contacts, probable cause to arrest in turn ripened into probable cause to search the car.

Johnson was not detained until police had a basis for a reasonable suspicion, he was not arrested until police had probable cause to arrest, and the car was not searched until police had probable cause to search it. Since no Fourth Amendment violation occurred at any point, we affirm the district court's rejection of Johnson's motions to suppress evidence arising out of these events. That court carefully examined the evidence, heard from the parties, and its considered conclusion

warrants our respect. *See*, *e.g.*, *United States v. Arvizu*, 534 U.S. 266, 276 (2002).

I.

On the evening of September 14, 2006, Baltimore City Police Detective Eric Green was monitoring the 1800 block of Pennsylvania Avenue in the city of Baltimore by video camera from a police station about five minutes' drive away. The block is reputedly home to a brisk open-air drug trade. Around 7 o'clock, Detective Green witnessed Johnson standing on the sidewalk of the street. He watched as Johnson, in rapid succession, made quick hand-to-hand contact with three different men, after which each of the three men immediately hurried off. Although he could not see an actual object being exchanged, it appeared to Green that something small was being passed between them. Green, who had made thousands of drug arrests based on observing hand-to-hand exchanges during his career, concluded that Johnson was dealing drugs. He immediately dispatched his partner, Officer Joseph Bannerman, and another officer to the scene.

While his colleagues were en route, Detective Green continued to monitor Johnson's movements. He watched as Johnson milled about on the sidewalk, briefly turned down a side street, and soon returned to the spot where the previous interactions had taken place. Green then saw two other people enter the frame, whereupon Johnson headed for a local Chinese carry-out restaurant with the two others appearing to follow. Green suspected Johnson was about to sell them drugs, since local dealers sometimes conduct their business in legitimate shops in order to elude police cameras.

Green alerted his colleagues that Johnson was taking the suspected buyers into the Chinese carry-out. Johnson and one of the suspected buyers entered the eatery as the police officers pulled up, but the second suspected buyer kept walking up the street after spotting the approaching police. Immedi-

ately upon arriving, Officer Bannerman entered the restaurant and approached Johnson, identified himself as a police officer, and asked to see Johnson's hands. Johnson, however, did not comply, instead throwing what Bannerman correctly believed to be a heroin gelcap over the restaurant counter. A struggle ensued, but Bannerman eventually gained the upper hand and Johnson was duly arrested and handcuffed. Bannerman recovered the gelcap and loaded Johnson into his patrol car. Johnson was found to be carrying $102 in cash.

While this was taking place, Detective Green reviewed a recording of the earlier surveillance video. In doing so, he noticed something he had originally overlooked. The video showed that just before the suspected drug deals, Johnson had gone to a car parked along the street, opened the passenger door, shut it, paced back and forth, reached back into the car and emerged appearing to hold something in his hand. Concluding that Johnson was using the car to store drugs, Green radioed to Officer Bannerman and instructed him to return to the scene and secure the car.

Officer Bannerman arrived at the car and looked inside the passenger side window. On the floor of the car, he saw a plastic bag containing baggies of gelcaps like the one Johnson had thrown during their tussle. Bannerman also saw a set of keys on the car seat. He relayed this information to Detective Green, who told him to bring the car back to the police station. Bannerman then opened the car door and saw that in addition to the gelcaps the plastic bag contained vials of what he suspected to be cocaine. Officer Bannerman drove the car back to the police station, whereupon Detective Green conducted a full search. He found fifty-six heroin gelcaps, thirty-nine cocaine vials, a mirror and scale, both of which had what appeared to be drug residue on them, a razor blade, and a loaded Rossi .38 Special handgun.

In March 2007, Johnson was charged by a federal grand jury with distribution and possession of cocaine and heroin

with intent to distribute under 21 U.S.C. § 841, possession of a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c), and being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). Prior to trial, Johnson filed two motions to suppress evidence. The court held a hearing on the issue, at which it viewed the surveillance footage and heard testimony from Detective Green, Officer Bannerman, and the officer who had accompanied Bannerman, as well as from Johnson. At the conclusion of the hearing, the court denied Johnson's suppression motions. Following a three-day jury trial, Johnson was convicted of all three charges and thereafter sentenced to 360 months' imprisonment. He now appeals from the denial of his suppression motions. He also challenges the sufficiency of the evidence on the two firearms charges and raises a Sixth Amendment objection to a portion of his sentence.

## II.

At the suppression hearing, Detective Green explained that Johnson's conduct appeared to him like drug-dealing "based on hundreds of observations in that area and hundreds of arrests." Johnson contends that Detective Green's experience counts for little, if anything. He argues that although Green's background and experience "certainly affected his perception of events, that experience simply could not transform Mr. Johnson's outwardly lawful behavior into a criminal offense." Appellant's Br. at 29.

Johnson's insistence that Green's training and experience count for little runs headlong into the teachings of the Supreme Court. As the Court has explained, "[a] trial judge views the facts of a particular case in light of the distinctive features and events of the community; likewise, a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that

deserve deference." *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

The Fourth Amendment requires such an approach. It is more practical than theoretical. Both the language of the Amendment, which prohibits "unreasonable searches and seizures," and the decisions of the Court interpreting it are purposely imprecise. They reflect a preference for case-by-case analysis, informed judgment, and an examination of the entire factual picture over any "neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

The reason for this is plain enough. The task the police perform requires them to translate the law's abstractions into actual practice in the unpredictable circumstances of the streets. This is at once a vital and a difficult mission. It is vital because errors in either direction—toward excessive intrusion or toward impotent enforcement—can be costly. It is difficult because the contexts are varying and, quite often, the time for deciding is short.

Getting the balance right is never guaranteed, but the chances of doing so are improved if officers, through training, knowledge, and experience in confronting criminality, are uniquely capable both of recognizing its signatures, and by the same token, of not reading suspicion into perfectly innocent and natural acts. In this way, experience leads not just to proper action but to prudent restraint. "Reasonableness" is a matter of probabilities, and probability in turn is best assessed when one has encountered variations on a given scenario many times before. *See United States v. Cortez*, 449 U.S. 411, 418 (1981).

Johnson simply fails to explain why the experience we extol in other walks of life should suddenly be devalued in the field of law enforcement. An experienced repairman may pick up on a problem the rest of us might overlook. The same is true of law enforcement officers, who may "draw on their

own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (internal quotations omitted). The Court's insistence on this point has been nothing less than overwhelming. *See id.*; *Ornelas*, 617 U.S. at 700; *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *United States v. Sokolow*, 490 U.S. 1, 13 (1989); *United States v. Sharpe*, 470 U.S. 675, 682 n.3 (1985); *Cortez*, 449 U.S. at 414, 421-22; *Brown v. Texas*, 443 U.S. 47, 52 n.2, (1979); *United States v. Ortiz*, 422 U.S. 891, 897 (1975); *United States v. Brignoni-Ponce*, 422 U.S., at 885 (1975); *Terry*, 392 U.S. at 27.

But while officers have the advantage of experience, they do not necessarily have the advantage of neutrality, and that is where district courts come in. Johnson, however, would discount their vantage point as well. At no point in his arguments to reverse its rulings does Johnson recognize the advantages of the district court's ability to consider the evidence first-hand. The only time Johnson so much as acknowledges the district court's fact-finding efforts is when he attacks its conclusion that he was seen on video handing something to the men with whom he made hand-to-hand contact. Johnson claims the "key distinction" between touching hands and exchanging an object "was lost on the district court"—as if the district court after hearing the evidence was forbidden to make a reasoned inference that something was being exchanged. Appellant's Reply Br. at 4.

This whole view essentially implies that the consideration expended in suppression hearings counts for naught. The district court, which sat in the city of Baltimore, considered the evidence fully. The suppression hearing it conducted spanned two days, and the transcript of the proceedings runs to well over 150 pages. The court heard from Johnson and the three police officers involved in his arrest. Both Green and Bannerman were subjected to cross-examination and re-cross. When Johnson questioned Bannerman's credibility, the court specif-

ically found that Bannerman was "perfectly credible" adding that "there's no doubt in my mind that this officer is truthful." The court also viewed the surveillance video.

District courts offer an unbiased forum to test the conclusions of police, and they possess a perspective that appellate forums cannot match. In examining evidence directly, those courts assess inflections and demeanor, the human dimensions and the practical demands in the situations before them. Here too the Supreme Court has called attention to a "district court's superior access to the evidence and the well-recognized inability of reviewing courts to reconstruct what happened in the courtroom." *Arvizu*, 534 U.S. at 276; *see also Ornelas*, 517 U.S. at 699.

Thus the role of courts of appeal is comparatively circumscribed. While it is true we examine legal determinations by district courts *de novo*, it is "a peculiar sort of *de novo* review." *Arvizu*, 534 U.S. at 278 (Scalia, J., concurring). We must not only accept factual determinations unless they are clearly in error, we must also "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers"—an acknowledgement that satellite imagery often cannot replicate community insights and on-the-ground intelligence. *Ornelas*, 517 U.S. at 699. Standards of review are formulated not out of some abstract fondness for legal terminology but to encapsulate insights about institutional vantage points. Courts of appeal have a comparative advantage born of collegial deliberations over matters of law while trial courts have a distinct edge when it comes to making context-sensitive judgments. The Fourth Amendment often implicates the latter more than the former, and the standard of review that governs in these cases is accordingly designed to ensure they are resolved concretely, not simply abstractly.

Johnson's invitation to reverse would move us in the wrong direction. His case is quintessentially one in which the offi-

cers involved and the district court that heard the evidence were better positioned than we to consider the merits of his claim. Does an officer's long experience end the inquiry? Of course not. But in the Supreme Court's Fourth Amendment calculus, it matters. Do a district court's superior eyes and ears end the inquiry? Of course not. But in the Supreme Court's Fourth Amendment calculus, they matter. So we shall keep them much in mind as we proceed.

## III.

In the case before us, Johnson argues that he was unreasonably seized by Officer Bannerman and that the district court should therefore have suppressed any evidence discovered as a result of the seizure. *See Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963); *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). Specifically, Johnson objects to the district court's having allowed evidence concerning the gelcap he threw, the cash found on his person, and the drugs, drug paraphernalia, and handgun discovered in the car. We review these claims in turn.

## A.

We begin with the gelcap Johnson attempted to dispose of when Officer Bannerman arrived. In Johnson's view, he was subjected to an unreasonable seizure when Bannerman entered the Chinese restaurant and ordered him to show his hands. This claim is mistaken.

Even assuming this initial encounter was a Fourth Amendment seizure, it was in no sense unreasonable. The Supreme Court has identified two kinds of personal seizures: (1) brief investigatory stops of the sort identified in *Terry v. Ohio*, 392 U.S. 1 (1968) and (2) arrests. *See United States v. Brown*, 401 F.3d 588, 592 (4th Cir. 2005). A so-called *Terry* stop allows a police officer whose observations lead him to suspect that a particular person has committed or is about to commit a

crime to detain the person briefly in order to "investigate the circumstances that provoke suspicion." *Brignoni-Ponce*, 422 U.S. at 881; *see also Adams v. Williams*, 407 U.S. 143, 145-46 (1972). So long as a temporary detention is for this limited purpose, it does not cross the line into a full-blown arrest. *See United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995). In this case, Officer Bannerman's conduct was entirely consistent with simply trying to ascertain who Johnson was and what he was doing. Prior to his formal arrest of Johnson, therefore, Officer Bannerman can be said at most to have subjected Johnson to a *Terry* stop.

A *Terry* stop satisfies the reasonableness requirement of the Fourth Amendment if there exists "a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). This requires only "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Cortez*, 449 U.S. at 417. But the officer's suspicions must also be more than an "inchoate and unparticularized suspicion or hunch." *Terry*, 392 U.S. at 27.

In this case, Officer Bannerman had an objective basis to think that Johnson was selling drugs. Johnson's conduct was entirely consistent with drug dealing. He was observed making similar hand-to-hand contact with multiple people and appeared to be waiting to meet them. The hasty, even furtive, nature of this series of encounters was much in keeping with an illicit handoff. Moreover, it is hard to imagine what else Johnson could have been doing. The only innocent explanation Johnson offers is that he could have been greeting the men he touched. But his conduct was hardly consistent with a social interaction. The other men did not linger or engage in conversation. They approached quickly and just as quickly quit the scene.

These observations, however, are only the beginning. The fact that this activity was taking place in a location well known for street-side drug-dealing alters the landscape of rea-

sonable inferences. The Supreme Court has held that the combination of presence in an area known for heavy narcotics trafficking and unprovoked flight upon seeing police arrive was enough to support a reasonable suspicion under *Terry*. *See Wardlow*, 528 U.S. at 124. Here we have a stronger case than that, for Johnson appeared to have been caught in the very act of drug-dealing for which the area was renowned. On top of that, one of the two suspected buyers who seemed to be following Johnson into the Chinese restaurant veered off at the sight of the police.

For all these reasons, Johnson's suggestion that upholding the denial of his suppression motions means that the police will be permitted to detain any person who is seen touching hands with someone else in a high crime area is well off the mark. There is nothing to suggest that the series of contacts in question were in any way social and much to suggest that they were instances of illegal drug dealing. Where there is a plausible claim to be made that a suspect has been caught *in flagrante delicto*, *Terry* standards are most often satisfied. Since Officer Bannerman did not violate Johnson's Fourth Amendment rights by requiring him to open his hands in the brief period before he attempted to arrest Johnson, evidence concerning the gelcap that Johnson threw during that period was not subject to suppression.

### B.

Next, we consider the money found on Johnson's person. This evidence was obtained as a result of Johnson's being placed under arrest. Because we conclude that the arrest did not violate the Fourth Amendment, the district court was again correct in rejecting Johnson's suppression claim.

Under the Fourth Amendment, a warrantless arrest is an unreasonable seizure unless there is probable cause to believe that a criminal offense has been or is being committed. *See United States v. Watson*, 423 U.S. 411, 417-424 (1976);

*Brinegar v. United States*, 338 U.S. 160, 175-176 (1949). The standard for whether probable cause exists is an objective one; it exists when, "at the time the arrest occurs, the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." *United States v. Manbeck*, 744 F.2d 360, 376 (4th Cir. 1984).

Johnson argues against a finding of probable cause, urging that much of his conduct could be seen as innocent. But as with the "reasonable suspicion" standard under *Terry*, "innocent behavior frequently will provide the basis for a showing of probable cause." *Gates*, 462 U.S. at 243 n.13. And as we noted earlier, "a police officer may draw inferences based on his own experience in deciding whether probable cause exists," *Ornelas*, 517 U.S. at 700, including inferences "that might well elude an untrained person," *Cortez*, 449 U.S. at 418.*

At any rate, assuming arguendo that probable cause to arrest did not already exist when Bannerman entered the Chinese restaurant, it certainly did by the time Bannerman actually attempted to arrest Johnson. The reasonable suspicion that would have supported an investigatory stop progressed to probable cause to arrest when Johnson reacted to Officer Ban-

---

*Johnson cites a handful of cases in which probable cause to arrest may have been lacking, but none of them presents the kind of circumstance we confront here, where a suspect is observed in the course of affirmatively committing a criminal act, as opposed to other behavior incriminating only by inference, such as flight. *See United States v. Christian*, 187 F.3d 663 (D.C. Cir. 1999); *United States v. Wilson*, 2 F.3d 226 (7th Cir. 1993); *United States v. Embry*, 546 F.2d 552 (3d Cir. 1976). The two cases from this circuit Johnson cites are likewise inapposite. The only holding in *United States v. Mayo*, 361 F.3d 802 (4th Cir. 2004) was that police could use evidence obtained from a *Terry* stop. *United States v. Sprinkle*, 106 F.3d 613 (4th Cir. 1997), meanwhile, held that the *Terry* standard was not met where a police officer "could actually see that nothing of a criminal nature was happening" at the moment he observed the defendant. *Id.* at 618. In this case, the officer actually observed the opposite.

nerman's commands by flinging what Bannerman believed to be a heroin gelcap over the restaurant counter. While Bannerman was entitled to conclude that the gelcap contained drugs simply from its appearance, the fact that Johnson attempted to discard it precisely when the police appeared provided even more reason to believe that Johnson had been caught red-handed. Once Johnson was observed in possession of illegal drugs, the officers certainly had probable cause to believe that the already suspicious series of hand-to-hand contacts were exactly what police suspected them of being. Accordingly, since the arrest did not violate the Fourth Amendment, the district court was correct in allowing evidence obtained as a result.

## C.

Finally, Johnson challenges the district court's refusal to suppress evidence concerning the drugs, drug paraphernalia, and handgun discovered in the car. Once again, we find no error.

Officers may search a readily mobile automobile if they have probable cause to believe that their search will uncover contraband. *See United States v. Kelly*, 592 F.3d 586, 589-91 (4th Cir. 2010). Here there was ample basis for probable cause. Officer Bannerman had probable cause to believe that Johnson had been engaging in drug crimes by the time he reached the car. Since Johnson was seen on video going to the car just before the hand-to-hand encounters that were at the heart of the probable cause to arrest, Bannerman in turn had probable cause to believe the car contained evidence of those activities. This was all the more so since when Bannerman looked into the car's window, an act that in no way violated the Fourth Amendment, he saw gelcaps in plain view like the one he had recovered from Johnson. *See Brown*, 460 U.S. at 740; *United States v. Taylor*, 90 F.3d 903, 909 n.4 (4th Cir. 1996).

IV.

In addition to his Fourth Amendment claims, Johnson challenges aspects of his conviction on two other grounds. First, Johnson argues his convictions on the two counts relating to possession of a firearm were not supported by sufficient evidence. Because a sufficiency claim must fail "if there is substantial evidence, viewed in the light most favorable to the Government, to support" the jury's verdict, *United States v. Cardwell*, 433 F.3d 378, 390 (4th Cir. 2005), we reject Johnson's claim. In light of our discussion of the more than ample reasons for the search of the car, we find no merit to Johnson's suggestion that there was insufficient evidence for the jury to conclude that he possessed the items found within it.

Finally, citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), Johnson also raises a Sixth Amendment challenge to his sentence enhancement under 18 U.S.C. § 924(e), the Armed Career Criminal Act. But since, as he acknowledges, we have already rejected the very argument he makes, *see United States v. Cheek*, 415 F.3d 349, 352-53 (4th Cir. 2005), this claim too must fail.

V.

For the foregoing reasons, the judgment is hereby

*AFFIRMED*