**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 22-4209**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

TREZITH RASHAD SMART,

Defendant - Appellant.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News.  David J. Novak, District Judge.  (4:18-cr-00095-DJN-LRL-1)

_____

Argued:  May 3, 2023                                  Decided:  January 22, 2024

_____

Before WYNN and RICHARDSON, Circuit Judges, and TRAXLER, Senior Circuit Judge.

_____

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Senior Judge Traxler joined.  Senior Judge Traxler wrote a concurring opinion.  Judge Wynn wrote a dissenting opinion.

_____

**ARGUED:**   James R. Theuer, JAMES R. THEUER, PLLC, Norfolk, Virginia, for Appellant.  Jacqueline Romy Bechara, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:** Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

_____

RICHARDSON, Circuit Judge:

Trezith Smart appeals his drug-trafficking convictions. He argues that (1) his prosecution violated the Speedy Trial Act, and (2) the district court should have granted his motion to suppress evidence from two traffic stops. We reject Smart's arguments that the Speedy Trial Act was violated. And we hold that both traffic stops were constitutional. So we affirm Smart's conviction.

## I.      Background

Smart's troubles started with a traffic stop on I-12 near Hammond, Louisiana. In March 2017, Louisiana State Trooper Shane Tilford—along with his partner Rex, a drug-sniffing dog—stopped Smart for speeding. During the traffic stop, Trooper Tilford became suspicious. He thought that Smart seemed nervous. He specifically noticed that Smart could provide only "clunky" answers to his questions, after long pauses, all while staring through his windshield. Trooper Tilford also noticed a gas can in Smart's car. So he deployed Rex. After Rex alerted, Trooper Tilford recovered 5.6 kilograms of cocaine from Smart's car.[1]

The next year, Agent Brad Smith of the Drug Enforcement Agency (DEA) was working with a confidential informant to investigate Harold Jones, a drug dealer based in Newport News, Virginia. The informant explained that Jones' cousin supplied his drugs. Running a license plate from the informant's tip led Agent Smith to suspect that Trezith Smart was Jones's supplier. And further investigation uncovered Smart's Louisiana stop.

---

[1] The record does not show whether Smart was ever charged in Louisiana.

With this corroborating information in hand, Agent Smith decided to use the informant to conduct a controlled buy. The controlled buy was a success. DEA agents observed Smart pick Jones up and drive to a parking lot, where Jones met with the informant and sold him cocaine.

Following the controlled buy, the DEA's investigation into Smart rolled along. In June 2018, agents were surveilling Smart's house when they saw him place a trash bag in the trunk of his vehicle. Smart drove towards the front of his housing complex, but then mysteriously stopped, left his vehicle, and then got back inside, returning to his house. When his vehicle returned to his house, and Smart re-opened the trunk, the agents noticed that it was empty—the trash bag was gone. So, after Smart drove away, the agents searched a nearby community dumpster and recovered a similar-looking trash bag. Inside the trash bag were plastic bags covered in cocaine residue.

Two months later, in August 2018, agents received court permission to place tracking devices on Smart's vehicles. When the agents thought that Smart's movements looked suspicious, they asked Newport News detectives to stop him. The detectives did so and recovered $15,000 in cash plus an ounce of cocaine.

By November 2018, the DEA decided that their investigation had revealed enough evidence to arrest Smart. On November 1, Agent Smith directed Trooper Michael Heath Miller of Virginia State Police to stop Smart's car. Trooper Miller conducted the stop and brought Smart to a parking lot to speak with Agent Smith, who hoped to persuade Smart to identify his suppliers. After being Mirandized and learning of the evidence against him, Smart agreed to cooperate. He gave Agent Smith some information about his suppliers.

3

He also authorized agents to search his Virginia home. Around the same time, other agents executed search warrants on Smart's other homes in North Carolina. These searches uncovered additional evidence of cocaine trafficking, along with several firearms.

Yet Smart's cooperation was short-lived. About a week later, he broke contact with Agent Smith and went on the run. So on December 10, 2018, while he was still on the lamb, federal authorities indicted Smart on one count of conspiracy to possess and distribute cocaine. He managed to evade the law for the better part of a year; but the police finally captured Smart in September 2019.

Smart's initial court appearance was on September 27, 2019. He was arraigned five days later. Then, on October 21, his attorney moved to withdraw because of a conflict of interest. Two days after, the district court granted this motion in a text order and also moved Smart's trial date. The order declared: "The ends of justice also require that the trial date of December 10, 2019 be stricken." J.A. 7. The next day, the district court appointed new counsel and later rescheduled the trial for January 22, 2020. But Smart's attorney shuffling continued. On November 11, his new counsel also moved to withdraw. After a hearing on November 25, the court granted that withdrawal motion too.

To add to the chaos, a week before Smart's scheduled trial date—on January 14, 2020—the government filed a superseding indictment. The superseding indictment expanded the duration of the conspiracy. It also added three new counts: one count of distribution of cocaine (for the controlled buy), one count of possession with the intent to distribute cocaine (for the August 2018 traffic stop), and one count of possession of a

4

firearm in furtherance of a drug-trafficking crime (for firearms seized during the search of Smart's houses). Smart was arraigned on this indictment three days later.

But Smart was not tried in January 2020 as scheduled. In fact, he would not face trial until almost two years later. There were many reasons for the delay. Smart cycled through two more attorneys before ultimately electing to represent himself. Incompetency proceedings caused further delay. COVID-19 prevented the court from conducting any trials for over nine months. And Smart's pretrial motions, including a motion to dismiss the indictment and a motion to suppress, delayed his trial even further.

Finally, Smart faced a jury on November 3, 2021. After a two-day trial, Smart was acquitted of his firearms charge. But he was convicted of the three drug charges: (1) conspiracy to possess and distribute cocaine, (2) distribution of cocaine, and (3) possession of cocaine with intent to distribute. As for drug weights, the jury found that the conspiracy involved at least 5 kilograms of cocaine. The district court sentenced Smart to 360 months' imprisonment. He timely appealed, and we have jurisdiction.

## II.  Discussion

Smart brings two claims on appeal. First, he argues that the government failed to bring him to trial on his original indictment within the time permitted by the Speedy Trial Act. Second, he challenges the district court's denial of his motion to suppress the evidence obtained from the March 2017 and November 2018 traffic stops.

### A.  Speedy Trial Act

We begin with Smart's Speedy Trial Act claim. The Act requires the government to proceed to trial within 70 days of the indictment or the defendant's initial court

5

appearance, whichever occurs later.   18 U.S.C. § 3161(c)(1).   But it also contains exceptions that toll this 70-day clock. *See* § 3161(h).  Relevant here is § 3161(h)(7), which excludes any period of delay caused by a continuance, so long as the court grants the continuance because it serves the "ends of justice" and the court sets forth its reasoning on the record.  § 3161(h)(7).

Let's lay out the timeline:  After Smart was indicted, he made his initial appearance on September 27, 2019.  So that's when the 70-day clock started.  And Smart was arraigned on the superseding indictment on January 17, 2020.  Thus, he argues that "more than seventy days elapsed between [his] initial appearance and his arraignment on the superseding indictment, violating his Speedy Trial Act rights."  Opening Br. at 18.  Absent sufficient tolling, he's right, because that's 112 days.  The question thus becomes whether enough of those days are excludable under the Act to reduce the number of days to 70.[2]

---

[2] Smart's Speedy Trial Act claim focuses on this period:  the days between Smart's initial appearance following the original indictment (September 2019) and his arraignment on the superseding indictment (January 2020).  But—as you might expect from its name— the Act's clock runs until the date of the defendant's *trial*.  *See* § 3161(c)(1) (requiring that "the trial of a defendant . . . shall commence within seventy days" of the defendant's indictment or appearance).  And Smart wasn't *tried* until November 2021—almost two more years after his arraignment on the superseding indictment.

Still, Smart does not assert that there was an independent Speedy Trial Act violation that occurred *after* January 2020 (perhaps, for instance, believing those days to fall within one of the Act's exceptions).  So we address only the claim he makes, asking whether 70 non-excludable days elapsed between Smart's initial appearance and his arraignment on the superseding indictment.

To that end, the parties agree that only one potential exclusion would be enough: the delay caused by the October 23, 2019 continuance.[3] But for that delay to be excluded, the continuance must have been granted in accordance with the statutory mandate in § 3161(h)(7). What, then, does the statute require?

Section 3161(h)(7) tells us that, to exclude delay caused by a continuance, two things must have happened: (1) the "judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial"; and (2) "the court sets forth, in the record of the case, either orally or in writing, its reasons for [the] finding[s]." § 3161(h)(7)(A); *see also Zedner v. United States*, 547 U.S. 489, 506–07 (2006).

The government argues that the district court's October 2019 order met these statutory requirements. That order granted a motion by Smart's attorney to withdraw based on a conflict of interest. And, at the same time, the order declared that "[t]he ends of justice also require that the trial date of December 10, 2019 be stricken." J.A. 7. New counsel was appointed, and the trial was rescheduled for January 22, 2020. As a result, the government argues that the delay between October 23 and January 22—amounting to 91

---

[3] The government argues that Smart has forfeited this argument by failing to challenge this period of delay when he moved to dismiss the indictment in the district court. While Smart did not specifically raise this delay in his pro se motion, he appeared to raise it at the hearing on his motion. And, at that hearing, the government did not respond with the waiver argument it now advances. Moreover, the district court explicitly considered and rejected Smart's argument in denying Smart's motion to dismiss. Given these circumstances, we decline to hold that Smart forfeited this challenge.

7

days—should be excluded from the Speedy Trial Act's clock. If that is so, then everyone agrees that the Act was not violated here.

We start with the statute's first requirement: The district court must have determined that granting a continuance satisfied § 3161(h)(7)'s balancing test. And we can indeed conclude that the district court (at this stage in the case, Judge Allen) performed this required balancing when it granted the continuance. *See United States v. Keith*, 42 F.3d 234, 237 (4th Cir. 1994) (noting that it must be "clear from the record that the court conducted the mandatory balancing contemporaneously with the granting of the continuance"). Judge Allen, in her October order, found that "the ends of justice require[d]" the case to be continued. J.A. 7. And the statute tells us that, to conclude that the ends of justice require a continuance, she must have necessarily determined that a continuance outweighs the interests of the public and the defendant in a speedy trial. *See* § 3161(h)(7)(A).

In other words, it is clear from the record that the court conducted the mandatory balancing contemporaneous with granting the continuance. *Keith*, 42 F.3d at 237. Nonetheless, the court's October order did not set forth the reasons for its finding. So the order did not *itself* satisfy the Act's second requirement.

That is not, however, fatal. We have held that the district court need not set forth its reasoning at the time of the continuance, but may place it on the record later, so long as the court does so before ruling on a motion to dismiss under the Speedy Trial Act. *United*

8

*States v. Henry*, 538 F.3d 300, 303–04 (4th Cir. 2008).[4] Here, the district court *did* provide reasons after-the-fact for finding that the October continuance served the interests of justice. In denying Smart's motion to dismiss the indictment in November 2021, the court (now Judge Novak) explained that, "[g]iven the complexity of the case and the amount of discovery involved, counsel could not have properly prepared for a trial." J.A. 437. Hence the court reasoned that "[f]orcing counsel to prepare to try this case by December 10, 2019—six weeks later—would have prejudiced the defense, thus raising the possibility of a miscarriage of justice." J.A. 438. So Judge Novak seems to have satisfied the second requirement of the Act by stating the reasons for Judge Allen's finding on the record.

But at this juncture, Smart objects. He does not question whether Judge Allen conducted the ends-of-justice balancing. Instead, he argues, citing our decision in *Henry*, that none of the reasons Judge Novak later provided are supported by the record from when Judge Allen granted the continuance. Opening Br. at 16. In other words, Smart believes that the lack of factual evidence from the time of Judge Allen's order precludes us from verifying whether she really considered the reasons later given by Judge Novak. And he provides two reasons to adopt his view. First, he argues that the Act requires the same

---

[4] We accept that our panel is bound by this holding. *See also United States v. Velazquez*, 52 F.4th 133, 138 (4th Cir. 2022); *Keith*, 42 F.3d at 237. It stems from the Supreme Court's statement in *Zedner* that "at the very least the Act implies that [the ends-of-justice] findings must be put on record by the time a district court rules on a defendant's motion to dismiss." 547 U.S. at 507. As the introductory phrase suggests, the Supreme Court did not *itself* decide that the Act permitted the finding to come after the initial grant. It only held that such a finding could not come after the motion-to-dismiss ruling. *See id.* at 507 n.7 (noting that the "best practice" is to place the findings in the record "at or near the time when [the court] grants the continuance").

9

judge who makes the ends-of-justice finding to also be the one who memorializes the reasons for this finding. Opening Br. at 17. Second, he argues that Judge Novak's reasons could not have motivated Judge Allen when she granted the continuance because Judge Allen did *not* continue the trial date again in November 2019, when Smart's *replacement* counsel also withdrew from representation. Opening Br. at 17–18.

We find these claims unpersuasive. Our decision in *Henry* concerned whether the district court made an ends-of-justice finding in the first place. 538 F.3d at 304. We concluded that it had failed to do so after uncovering no evidence that it had ever balanced the § 3161(h)(7) factors. *Id.* at 304–05. In Smart's case, by contrast, it is abundantly clear from the record that Judge Allen *did* make an ends-of-justice finding when she granted the continuance—indeed, Smart does not contest this point. And we think it equally clear *why* she did so. Judge Allen granted the continuance at the same time she permitted Smart's counsel to withdraw. So she clearly must have concluded, as Judge Novak later explained, that the appointment of new counsel and that counsel's obvious need to prepare for trial in a case of some complexity justified the continuance. Thus, it is clear from the record that the court made an ends-of-justice finding and explained the reasons for that finding before ruling on Smart's motion to dismiss.

Smart's remaining arguments equally fail. The statute requires the "judge" to grant an ends-of-justice continuance "on the basis of his [ends-of-justice] findings," yet separately requires "the court" to set forth "its reasons" for the findings. 18 U.S.C. § 3161(h)(7)(A). So there is no blanket rule that the same judge who grants the ends-of-justice continuance must also state his reasons on the record. *See United States v.*

10

*Gottesfeld*, 18 F.4th 1, 8 (1st Cir. 2021); *United States v. Dignam*, 716 F.3d 915, 922 (5th Cir. 2013); *see also Keith*, 42 F.4th at 237–38 (considering whether a different judge's actions cured the deficiencies of the judge who granted a continuance).  And we cannot fairly draw inferences between the two instances when Smart's counsels withdrew from the case.  Counsel are allowed to withdraw for different reasons and at different stages. More importantly, when Smart's replacement counsel withdrew in November 2019, Smart requested that Judge Allen immediately appoint new counsel for him *so that he could get a speedy trial*.  Yet he made no such request when his counsel withdrew in October 2019. So we cannot reasonably infer anything about the reasons for the October 2019 continuance from the fact that the court did not continue the trial in November 2019.

We therefore reject Smart's arguments for finding a Speedy Trial Act violation here.

### B.      Motion to suppress

We now turn to Smart's second argument:  the district court improperly denied his motion to suppress the evidence from two traffic stops.  We disagree.[5]

After initiating a valid traffic stop in March 2017, Trooper Tilford extended the stop to deploy his drug-sniffing dog, Rex.[6]  Absent consent, an officer's decision to extend a traffic stop to conduct a dog sniff must be supported by reasonable suspicion of criminal

---

[5] We review de novo a district court's determinations of reasonable suspicion and probable cause.  *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016).  In doing so, we review the district court's factual findings for clear error.  *Id.*  And, because it prevailed below, we view the evidence in the light most favorable to the government.  *Id.*

[6] Smart concedes that, because he was speeding, Trooper Tilford had probable cause to pull him over.  For its part, the government concedes that Trooper Tilford extended the stop by deploying Rex.

11

activity. *United States v. Miller*, 54 F.4th 219, 228 (4th Cir. 2022). Reasonable suspicion is a low bar, requiring "a showing considerably less than preponderance of the evidence," but "more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (cleaned up) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)); *see also Kansas v. Glover*, 140 S. Ct. 1183, 1187–88 (2020).

To establish a reasonable suspicion of criminal activity, an officer must identify "'specific and articulable facts' that demonstrate at least 'a minimal level of objective justification' for the belief that criminal activity is afoot." *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008) (cleaned up) (quoting *Terry*, 392 U.S. at 21; *Wardlow*, 528 U.S. at 123). We assess these facts both individually and in their totality. *See United States v. Bowman*, 884 F.3d 200, 214, 218 (4th Cir. 2018). And, in assessing them, we are mindful that reasonable suspicion is a "commonsense, nontechnical" notion resting on the "practical considerations of everyday life." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (cleaned up) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). Thus, we give due deference to "the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993).

In his police report, Trooper Tilford identified two facts that made him suspect that criminal activity was afoot: Smart's (1) "extreme nervousness" and (2) "inconsistent travel itinerary." J.A. 419 ("Given Mr. Smart's extreme nervousness and inconsistent travel itinerary, I believed that Smart may be involved in criminal activity."). Later, at the suppression hearing, when Trooper Tilford was asked about what made him suspicious, he articulated more specific facts to explain his conclusion that Smart was "extremely

12

nervous": Smart took "long pauses while staring through the windshield" before answering his questions, resulting in a "very clunky" conversation. J.A. 113–14. Trooper Tilford also added one more fact that made him suspicious: the presence of a gas can in the passenger compartment of Smart's car. The district court relied on all these facts to hold that Trooper Tilford had a reasonable suspicion to deploy his drug-sniffing dog.[7]

Taken together, we agree that these facts support a finding of reasonable suspicion. We begin with the presence of the gas can in Smart's car. At first blush, this doesn't seem like much. After all, keeping a gas can in your car can be perfectly innocuous behavior. But even innocent conduct can, in the right circumstances, create a reasonable suspicion of criminal activity. *See United States v. Sokolow*, 490 U.S. 1, 9–10 (1989). And here, the circumstances reasonably made Trooper Tilford suspicious of criminal activity.

To start, the circumstances of the traffic stop revealed to Trooper Tilford that many of the benign explanations for keeping a gas can in your car did not make sense for Smart. Such explanations—suppose, for example, that you need to fill up your lawnmower— usually involve local trips around town. But it was clear to Trooper Tilford during the stop that Smart wasn't on a local trip around town; he was on a long-haul journey. Smart was traveling on a major interstate, and he directly told Trooper Tilford that he was on an

---

[7] The police report is, of course, hearsay. And it is unusual to rely on a police report from a testifying officer to supplement his testimony. But it is not forbidden. The rule against hearsay, like all the Rules of Evidence except those on privileges, does not apply at suppression hearings. *See United States v. Sowards*, 690 F.3d 583, 589 n.5 (4th Cir. 2012); *see also United States v. Matlock,* 415 U.S. 164, 175 (1974). So the report was fair game.

13

extended trip.[8]  Unlike a local excursion around town, keeping a gas can inside your car during a cross-country trip is unusual behavior.  As Trooper Tilford testified, "most people don't want to *travel* with a gas can with the fumes inside their vehicle."  J.A. 113 (emphasis added).  By linking the gas can and travel, Trooper Tilford removed the obvious, innocent explanations for Smart's conduct.

Not only did the circumstances exclude many of the innocent explanations, but— more importantly—Trooper Tilford connected the behavior to criminal activity.  He testified, based on his training and experience, that drug traffickers keep gas cans in their car.  He had seen drug traffickers travel with gas cans in their cars during his time as a drug-interdiction officer.  And he provided an explanation for this behavior: Drug traffickers travel with gas cans to avoid stopping at gas stations.  J.A. 113 ("A lot of times what guys will do is if they're going to go pick up a load of dope, they will bring gas with them to avoid having to stop at any gas stations to get their return trip as fast as possible.").

From our vantage point, this explanation is somewhat puzzling.  *Cf. United States v. Acuna*, No. 21-10035, 2022 WL 3081419, at *3 (D. Kan. Aug. 3, 2022) (discussing an alternative explanation for why drug traffickers carry gas cans).  Yet our vantage point is quite removed from that of a drug-interdiction officer versed in that law-enforcement field. It is also removed from that of a district court examining evidence directly.  Our detached perspective does not mean that we may *never* second guess officers or district courts.  But

---

[8] Smart told Trooper Tilford that he was traveling from Lake Charles, Louisiana— the other side of the state—to either Biloxi, Mississippi or North Carolina (or, perhaps, both).

14

our precedent still makes one thing clear: "[I]t matters." *United States v. Johnson*, 599 F.3d 339, 344 (4th Cir. 2010).

Why does our detached perspective matter? Because we must account for each actor's institutional strengths and weaknesses. Since they are the ones who see and hear testimony, district courts have the "superior eyes and ears" to weigh the parties' evidence and judge a witness's credibility. *Id.* at 343–44. Likewise, given that they "observe on a daily basis what transpires on the street," police officers have "practical experience" about what behaviors are linked to crime may prove useful to a district court making a reasonable-suspicion inquiry. *Lender*, 985 F.2d at 154. So, if a district court finds an officer to be a credible witness, it may rely on inferences that the officer draws based on his training and experience to support reasonable suspicion. *See id.*; *Johnson*, 599 F.3d at 342–43.

That's exactly what the district court did here; it found Trooper Tilford's testimony credible and relied on it. *See Johnson*, 599 F.3d at 342–44; *United States v. Bumpers*, 705 F.3d 168, 173–74 (4th Cir. 2013); *United States v. Hernandez-Mendez*, 626 F.3d 203, 208 (4th Cir. 2010). And *we* should rely on both Trooper Tilford's inference and the district court's "context-sensitive judgment[ ]" to trust that inference.[9] *Johnson*, 599 F.3d at 344. For us, that dual reliance makes a difference. We—like the district court—credit Trooper Tilford's insight that traveling long distances with a gas can inside your car can be behavior that objectively indicates drug trafficking. *See Johnson*, 599 F.3d at 343–44; *Ornelas*, 517

---

[9] Our reliance is all the more appropriate given that Smart has never challenged—before the district court or on appeal—Trooper Tilford's belief that drug traffickers travel with gas cans or his explanation for why they do so.

15

U.S. at 699–700; *United States v. Dickey-Bey*, 393 F.3d 449, 453 (4th Cir. 2004) (noting that we must use a "pragmatic, common sense approach, [ ] defer[ring] to the expertise and experience of law enforcement officers at the scene"). So the gas can weighs in favor of a reasonable-suspicion finding.

What's more, the gas can was not the only thing that made Trooper Tilford suspicious. He also noted that Smart "at times was unable to answer questions" about his travel plans. J.A. 402. And, when Smart did provide answers, Trooper Tilford concluded that they were "inconsistent": "Mr. Smart at one point advised he was traveling to Biloxi, Mississippi and moments later stated he was trying to get home to North Carolina." J.A. 402. The inability to answer questions about your travel plans, coupled with the provision of differing answers when pressed, commonly supports reasonable suspicion in drug-trafficking cases. *See United States v. Vaughan*, 700 F.3d 705, 712 (4th Cir. 2012); *United States v. Mason*, 628 F.3d 123, 129 (4th Cir. 2010); *United States v. Simpson*, 609 F.3d 1140, 1148–50 (10th Cir. 2010); *see also De La Rosa v. White*, 852 F.3d 740, 746 (8th Cir. 2017).

Smart argues for the first time on appeal that his answers were not *necessarily* inconsistent. He notes that it's possible to drive from where he was pulled over in Hammond through Biloxi on the way back to North Carolina. Therefore, he argues, the answers that he provided to Trooper Tilford when asked about his travel plans could not have reasonably aroused suspicion.

Ordinarily, arguments raised for the first time on appeal are waived. *See United States v. Lester*, 985 F.3d 377, 386–87 (4th Cir. 2021). Yet even if we consider Smart's

16

argument, it fails on its own terms.  For one thing, Smart essentially asks us to view the evidence in the light most favorable to him.  But when the government prevails below, we must view the evidence in the light most favorable to it.  *Palmer*, 820 F.3d at 648.

Relatedly, "the existence of a plausible innocent explanation does not preclude a finding of reasonable suspicion."  *United States v. Pettit*, 785 F.3d 1374, 1381 (10th Cir. 2015).  That is particularly true when, as here, the plausible explanation is only advanced after the district court has decided the issue.  Indeed, Smart admitted to the district court that he lied to Trooper Tilford about his travel plans.  So Smart's post-hoc innocent explanation does not undo the relevance of this information to the reasonable suspicion inquiry.

Put differently, Smart's new argument that his travel plans weren't necessarily inconsistent does not render the district court's contrary finding clearly erroneous.  *Cf. United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012) (explaining that a factual finding is not clearly erroneous if it is "plausible in light of the record viewed in its entirety").  Because the district court did not clearly err, we accept its finding that Smart's travel plans were inconsistent.  *See Palmer*, 820 F.3d at 648.  And inconsistent travel plans can support reasonable suspicion.

Lastly, Trooper Tilford noted in his police report that Smart was "extremely nervous."  J.A. 402.  Granted, "nervousness is not a *particularly* good indicator of criminal activity, because most everyone is nervous when interacting with the police."  *Palmer*, 820 F.3d at 652–53 n.7 (emphasis added).  But we have held that nervousness can still be a "relevant factor" to the reasonable suspicion inquiry where (1) the suspect's nervousness

17

is extreme—"unusual, beyond the norm, or evasive"—and (2) the officer articulates specific facts supporting his conclusion that the suspect was extremely nervous. *See Miller*, 54 F.4th at 229.

We have both elements here. In his police report, Trooper Tilford did not merely describe Smart as "nervous"; he wrote that Smart appeared "*extremely* nervous." J.A. 402 (emphasis added). And, at the suppression hearing, Trooper Tilford identified some facts supporting that conclusion: Smart would take "long pauses while staring through the windshield" before answering his questions, resulting in a "very clunky" conversation.[10] J.A. 114. Additionally, though Trooper Tilford did not know it at the time, Smart testified that he was high on cocaine when he was stopped—a fact consistent with Trooper Tilford's observation that Smart appeared extremely nervous. All things considered, Smart's nervousness provides some limited support for a finding of reasonable suspicion.

We need not decide whether any one of these facts *alone* might support a finding of reasonable suspicion. Reasonable suspicion is based on the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). And looking at the circumstances as a whole—giving due weight to Trooper Tilford's experience and the district court's factual findings—Trooper Tilford had a reasonable suspicion that criminal activity was afoot. *See United States v. Rubio-Rivera*, 917 F.2d 1271, 1277 (10th Cir. 1990) (concluding that the

---

[10] Difficulty answering questions and avoiding eye contact might seem to suggest merely run-of-the-mill nerves. But Trooper Tilford was so concerned with Smart's apparent "anxiety" and "stress" that he paused the interview and returned to his vehicle to deescalate the encounter. J.A. 115. Given that we must view the record in the light most favorable to the government, *see Palmer*, 820 F.3d at 648, we cannot say that the district court *clearly erred* in concluding that Smart was "extremely nervous."

agent had "reasonable suspicion that the defendant was transporting contraband" where the defendant was "apprehensive and would not establish eye contact," gave inconsistent explanations for his trip, and "had a container of gas on the rear floor," which the agent "testified was consistent with a concealed compartment"). So his decision to extend the March 2017 traffic stop to deploy his drug-sniffing dog did not violate the Fourth Amendment.[11] Accordingly, the district court properly denied Smart's motion to suppress.

\*          \*          \*

In sum, the district court properly denied Smart's motion to suppress. And Smart fails to show the Speedy Trial Act was violated. So we

*AFFIRM.*

---

[11] Smart also challenges the November 2018 stop. He concedes that the police validly stopped him and searched his vehicle. But he argues that the police lacked probable cause to take him into custody after the stop. Yet on top of the 5 kilograms of cocaine from the March 2017 traffic stop and the statements Smart made following the stop, there was the successful controlled buy, the evidence of drug trafficking from the trash pull, and the August 2018 traffic stop that recovered an ounce of cocaine on Smart. This is more than enough to establish probable cause. *See United States v. Clyburn*, 24 F.3d 613, 617–18 (4th Cir. 1994); *United States v. Blackwood*, 913 F.2d 139, 142–43 (4th Cir. 1990).

19

TRAXLER, Senior Circuit Judge, concurring:

I concur in the majority opinion. At the suppression hearing, the record before the district court consisted of the testimony of Trooper Tilford, his contemporaneous case report, the dash cam video, and Smart's testimony. I write separately to highlight the additional evidence that was presented at the suppression hearing that supports the district court's decision to deny Smart's motion to suppress the drugs found during the Louisiana traffic stop.

I.

Trooper Tilford is an experienced drug interdiction officer who was traveling with Rex, his drug-sniffing dog, on the night of the Louisiana search. At approximately 8:50 p.m., he was monitoring traffic on Interstate 12. He was not specifically looking for Smart, nor was his decision to stop Smart motivated by his drug interdiction duties. Nevertheless, interdiction officers are "state troopers first," charged with stopping motorists who pose safety concerns. J.A. 109. Normally, interdiction officers will simply send a speeder on his way with a warning. For several legitimate reasons, Trooper Tilford did not do so here.

Trooper Tilford's attention was first drawn to Smart when his radar clocked Smart's car—a Ford Focus with a North Carolina tag—traveling 82 mph in a 70-mph zone. Trooper Tilford pulled out to stop Smart. Smart, however, did not respond in the normal way. Trooper Tilford testified that, ordinarily, "when someone sees [me] pull out on them, I will get the entire pack of cars, everybody will start hitting their brakes because . . . it's the anxiety of 'is it me' type deal." J.A. 111. Smart, however, "almost looked like he was . . . just trying to sort through traffic to get away. . . . [H]e wasn't fleeing. . . . But it wasn't

20

a response like the rest of everyone else, concerned of whether they were about to be pulled over." *Id.*; *see* J.A. 128 ("Once I get behind th[e] vehicles, most people have a tendency to, whoop, I just saw that trooper pull out on me. They all pull over to the right and they slow down. [Smart], on the other hand, did not slow down initially, and [he] stayed in the left-hand lane when I verified [his] speed."). Trooper Tilford testified that it took a bit of time to catch up to Smart because Smart "had gone in and out of traffic a couple times," but "then slowed down once he got through traffic." J.A. 109. "[O]nce [Smart] passed all of the vehicles" and saw that Trooper Tilford "wasn't going anywhere, [he] pulled over to the right lane." J.A. 131.

Trooper Tilford got out of his patrol vehicle, approached the passenger side of Smart's vehicle, and motioned for Smart to roll the window down. In the front passenger area next to Smart, Trooper Tilford saw a five-gallon can of gas. Based on his training and experience, Trooper Tilford found this suspicious. First, it was "odd because most people don't want to travel with a gas can with the fumes inside their vehicle." J.A. 113. Second, he had seen gas cans in cars before during his interdiction work and he knew that drug traffickers, "if they're going to go pick up a load of dope, they will bring gas with them to avoid having to stop at any gas stations to get their return trip as fast as possible." *Id.*

Trooper Tilford engaged Smart in general conversation for approximately two minutes, during which Smart exhibited abnormal behavior and signs of "extreme nervousness." J.A. 403. After Trooper Tilford told Smart he pulled him over for speeding, Smart "debated" Trooper Tilford as to "whether he was speeding or not and the speed that he was traveling." Smart claimed, "'I know better than that. I had my cruise control set at

21

80.'" J.A. 112. This, of course, was actually an admission that he had been speeding. Smart also exhibited "an aversion to [Trooper Tilford's] presence." J.A. 113. Although not necessarily uncommon, Trooper Tilford "wanted to make sure that this was not just a 'I don't like interactions with the police' and that this wasn't something more." J.A. 114. So Trooper Tilford continued to engage Smart in normal conversation, assuring Smart that he just "need[ed] to slow down." *Id.* Smart's responses, however, were "very clunky, at best." J.A. 114. [I]t wasn't flowing. . . . [I]t was deliberate answers, and then it was long pauses while staring through the windshield, not looking at me." *Id.* Trooper Tilford testified that he felt that Smart was "'going to drive off . . . when [he] saw him looking forward through the windshield and not answering [his] question." *Id.*

Trooper Tilford asked Smart about his travel plans and received hesitant and inconsistent responses. Trooper Tilford stated that "Smart was extremely nervous during [the] interview and at times was unable to answer questions as to his travel itinerary and required long pauses in his sentences." J.A. 403. He initially "advised he was traveling from Lake Charles, Louisiana where he visited family for a 'few' days and was on his way to Biloxi, Mississippi. Moments later, he stated he was trying to get home to North Carolina." *Id.* While inquiring into Smart's travel plans, Trooper Tilford testified that "Smart paused and stared at the windshield for several moments prompting [Trooper Tilford] to ask him if [he] was in fact alright." *Id.* The dash cam video also confirms that Trooper Tilford was concerned enough about Smart's behavior to ask if he was okay.

On cross-examination by Smart, who was *pro se* at the time of the hearing,[1] Trooper Tilford further explained his suspicions.

> [M]y senses were heightened to your possible criminal activity. Gas cans in the vehicle. My interview with you wasn't just normal answers. It wasn't even just "I don't like the police" answers. It was a far-off, thousand-yard stare like I need to get out of here.

J.A. 148.

> And after you stop thousands of cars in your career, you can tell when someone is having an issue. Just like I asked you, "Are you okay?" That was for a reason. That's because you were not giving normal responses. You were in a far-off place thinking about what you were going to do next.

J.A. 149.

At this point, Trooper Tilford "wanted to bring the anxiety and the stress on [Smart's] end down," because he "knew that if [he] kept pressing the issue there, [he] was going to have a problem." J.A. 115. Trooper Tilford was alone and didn't "want to get into a chase" with Smart on the interstate. *Id.* So, seconds after he asked Smart if he was okay, Trooper Tilford "put a pause" on the interaction and returned to his patrol vehicle. *Id.* Smart was able to remain in his vehicle alone for approximately seven minutes to compose himself—while Trooper Tilford ran Smart's driver's license, registration, and criminal history, and contacted his partner to come to the scene.

Smart also testified at the suppression hearing. He never disputed Trooper Tilford's testimony that he exhibited signs of excessive nervousness, stress, and anxiety. He did not attempt to refute Trooper Tilford's testimony regarding his inconsistent responses about

---

[1] As noted in the majority opinion, Smart had been through five attorneys before ultimately deciding that he wanted to represent himself before the district court.

23

his travel plans. And he did not question Trooper Tilford's testimony regarding the suspicious nature of the gas can. On the contrary, Smart's testimony corroborated Trooper Tilford's observations on these points.[2]

First, Smart confirmed that he saw Trooper Tilford "coming up" behind him and knew that he was "probably police." J.A. 167. He testified that "usually when I think it's police, you know, I just get off the road to avoid them. Tonight, I don't know what I was thinking. I'm just doing something different [because] I was high." *Id.* Indeed, Smart freely admitted, several times, that he "was getting high," "doing cocaine, and . . . smoking cigarettes" on the trip. J.A. 166. Smart also confirmed Trooper Tilford's testimony that he stared out of the windshield, avoided eye contact with the officer, and wouldn't answer his questions.

> And then [the trooper] pulled me over. He said I was speeding doing 82. And like he said, I just looked forward because I just was like, "I can't believe you pulled me over and you're lying on me." So I didn't even want to speak to him. I didn't want to say nothing to him.

J.A. 168.

Smart's testimony about his travel plans also corroborated Trooper Tilford's suspicions when Smart was unable to answer his questions freely and gave responses that were inconsistent and riddled with pauses and evasiveness:

> And he's like, "Well, where are you coming from?

---

[2] Smart's testimony at the suppression hearing was confined to his claim that there was no probable cause to stop him because he was not speeding and no probable cause to believe that drugs were in his vehicle because Rex did not alert to the presence of drugs. He has abandoned both of these claims on appeal.

24

And I told him, you know, "Lake Charles."

He said, "Where are you going?"

And I said, you know, "I'm going" – I can't remember where I said I was going. . . .  I didn't want to talk to him at all.  I just wanted to tell him something just because I didn't want to talk to him.  I wanted to tell him to mind his damn business.

J.A. 168.  So, Smart "just made up something."  J.A. 168; *see also* J.A. 178 (admitting he was "high" and "ultimately provided [the trooper] with false information about [his] travels").[3]

After Trooper Tilford gave Smart time to bring down his levels of stress and anxiety, and his partner arrived to assist, he returned to Smart's vehicle.  He told Smart he was going to let him go and asked Smart to join him at the front of his patrol car for a brief conversation.  Smart confirmed Trooper Tilford's testimony on this point too:

And [Trooper Tilford] comes back.  And I remember him speaking to me, and he was like, "Well, everything is good.  I'm going to let you go.  Just come back to the car right quick and I want to speak to you right quick."

. . . .

And I'm thinking he just going to, you know, get me a ticket and let me go.  Everything is good on my car.  Everything good on my license.  I'm thinking he's just going to give me a ticket and just let me go.  Then he started questioning me and asking me do I have things in the car and stuff like that.

J.A. 170.  Clearly, Trooper Tilford's actions were designed to get Smart out of and away from his vehicle and safely allow the dog sniff to occur.

---

[3] Smart later confirmed to another officer that he was not traveling from Lake Charles, but rather had left North Carolina, driven to Houston where he picked up the drugs, and was traveling back to North Carolina when he was stopped.

25

After Smart denied that he had drugs in the car, Trooper Tilford told Smart that a dog sniff would be conducted. The dog alerted to the presence of drugs in the car. When Smart was told that the car would be searched, he became agitated and attempted to pull away from the troopers in order to get back to his vehicle. A struggle ensued. Trooper Tilford injured his hand, but he and his partner eventually gained control of Smart and placed him in handcuffs. During the search, Trooper Tilford recovered the full 5-gallon gas can from the front passenger seat area, a second, full 5-gallon gas can in the trunk of the vehicle, and five individually wrapped bundles containing cocaine under the front seats, near the first gas can, with a total weight of 5.6 kilograms.[4]

## II.

The Fourth Amendment permits a law enforcement officer to prolong a lawful traffic stop to conduct a dog sniff when he has "reasonable suspicion" that the person stopped is engaged in other criminal activity. *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). In determining whether reasonable suspicion justified prolonging the stop, courts "must look at the totality of the circumstances . . . to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (cleaned up). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is

---

[4] Smart told the troopers that they "needed to let him kill himself and light his car on fire." J.A. 404. Smart also said that "he knew better [than] to get out of his vehicle and that he should have set the car on fire." *Id.*

26

necessary for probable cause." *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020). The totality-of-the-circumstances inquiry also takes into account the expertise of law enforcement officers—"allow[ing] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (cleaned up). "[F]actors consistent with innocent travel can, *when taken together*, give rise to reasonable suspicion." *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004).

Our role on appeal is "circumscribed." *United States v. Johnson*, 599 F.3d 339, 344 (4th Cir. 2010). "[W]e examine legal determinations by district court's *de novo*, [but] it is a peculiar sort of *de novo* review." *Id.* (cleaned up). "We must not only accept factual determinations unless they are clearly in error, we must also give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." *Id.* (cleaned up). We may affirm the court's order on "any reason supported by the record, even if it is not the basis relied upon by the district court." *United States v. Swann*, 149 F.3d 271, 277 (4th Cir. 1998); *accord United States v. Patterson*, 278 F.3d 315, 318 (4th Cir. 2002).

## III.

Here, the district court conducted an evidentiary hearing, heard and considered all of the testimony, including the admissions of Smart, and found that Smart was excessively nervous, gave inconsistent responses to the trooper's questions about his travel plans, and possessed a full gas can inside the vehicle—which is a known indicator of drug trafficking.

The totality of these circumstances, including the reasonable inferences drawn from them by the trooper, provided the objective justification necessary for the trooper to reasonably suspect that Smart was carrying illegal drugs and, therefore, to prolong the stop to conduct a dog-sniff. Like my colleague in the majority, I have no trouble concluding that the district court's factual findings are fully supported by the evidence presented at the suppression hearing and that its legal conclusion was not erroneous. *See United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016) ("Absent clear error, we will not disturb factual findings made by a district court after an evidentiary hearing on suppression issues.").

I begin with Smart's extreme nervousness. General nervousness, divorced from evasiveness, "'is of limited value to reasonable suspicion analyses,'" because nearly everyone is nervous when they are pulled over by the police. *United States v. Bowman*, 884 F.3d 200, 214 (4th Cir. 2018) (quoting *United States v. Massenburg*, 654 F.3d 480, 490 (4th Cir. 2011)). But nervousness that is "unusual, beyond the norm, or evasive" will not be discounted. *United States v. Miller*, 54 F.4th 219, 229 (4th Cir. 2022). Trooper Tilford testified that Smart's nervousness was unusual, beyond the norm, *and* evasive. And he explained why.

First, Smart did not respond in the normal way from the moment Trooper Tilford pulled out behind him. Instead of slowing down or putting on his brakes, Smart stayed in the left-hand lane and began sorting through traffic, making it difficult for the trooper to catch up to him. Smart did not finally pull over to the right lane until after he had passed all of the vehicles and saw that the trooper wasn't going anywhere. *See Miller*, 54 F.4th at 229 (noting that "[o]ther relevant factors include the road the driver was traveling on and

28

the length of time it took the driver to pull over.").  Trooper Tilford testified to Smart's unusual and evasive behavior, and Smart confirmed it.

Second, Smart immediately exhibited signs of extreme anxiety and stress that concerned Trooper Tilford.  Smart was initially averse to the trooper's presence and he argued that he was not speeding while simultaneously admitting that he was.  Trooper Tilford engaged Smart in a collegial way, telling him why he pulled him over and that he just needed to slow down.  But Smart's anxiety did not dissipate.  His answers were clunky and deliberate, interspersed with "long pauses while staring through the windshield [and] not looking at" the trooper—all of which led to Trooper Tilford's suspicion that Smart was planning his next move and one that might result in a dangerous situation to other motorists and himself.  J.A. 114.  Trooper Tilford was so concerned about Smart's behavior that he asked Smart if he was all right and, seconds later, paused the interaction to allow Smart to calm down.  Smart did not dispute that he exhibited excessive nervousness and evasive behaviors.  He confirmed it.[5]

Having heard and reviewed all of the evidence presented, the district court credited Trooper Tilford's testimony and found that Smart exhibited extreme nervousness.  I see no basis upon which to conclude that this finding is clearly erroneous.

---

[5] Trooper Tilford, of course, could have immediately deployed Rex for a canine sniff during the lawful traffic stop.  *See Rodriquez v. United States*, 575 U.S. 348, 350, 355 (2015); *Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005).  The reasonable inference from the testimony is that Trooper Tilford's observations and concerns led him to take measures to calm Smart down and avoid a potentially dangerous situation for other motorists and himself should Smart suddenly drive off and make a run for it.

In his reply brief, Smart argued—for the first time—that the district court erred in finding that he exhibited extreme nervousness because, in his view, the dash cam video shows that his nervousness had subsided when he joined Trooper Tilford at the front of the patrol vehicle. Our good colleague in dissent agrees, relying on cases in which we have held that, also *relevant* to the totality-of-the-circumstances inquiry, is "whether [the suspect's] nervousness subsided or increased after the initial stop." *Miller*, 54 F.4th at 229.

Even if Smart had not waived this argument by failing to raise it before the district court or in his opening brief to us, the argument fails on the merits because it requires us to view the evidence in the light most favorable to Smart, not the government, and it ignores the events that led up to Smart exiting his vehicle. *See Palmer*, 820 F.3d at 648 (requiring us to review the testimony and evidence in the light most favorable to the government). The 90-second dash cam clip relied upon by Smart only depicts his behavior *after* Trooper Tilford paused the interaction to allow Smart some time to bring down his extreme levels of anxiety and stress, and *after* he told Smart that "everything [was] good" and that he was "going to let [him] go." J.A. 170. It tells us nothing about Smart's demeanor *before* he exited the vehicle. Also, the district court made it clear at the start of the suppression hearing that it had reviewed the dash cam video. It is certainly a reasonable inference that Smart's anxiety, assuming it had diminished, had decreased because he was given time to calm down *and* told that he was going to be sent on his way. Therefore, the dash cam video also does not warrant the conclusion that the district court clearly erred in finding, based upon all of the evidence, that Smart did indeed exhibit excessively nervous and evasive behaviors while he was in his vehicle and before he was told that he would be let go.

30

Trooper Tilford also testified that, during their initial encounter, Smart gave inconsistent responses when asked about his travel plans—another factor that can support reasonable suspicion. *See United States v. Vaughn*, 700 F.3d 705, 712 (4th Cir. 2012) (Conflicting responses about one's travels "remains a valid factor contributing to reasonable suspicion.")

On appeal, Smart argues (again for the first time) that the trooper and the district court should not have relied upon his responses about his travel plans because his answers *could* have been consistent. And, again, our colleague in dissent agrees, concluding that the district court's factual finding on this point is clearly erroneous because Smart *could* have been driving to Biloxi first and then to North Carolina. He wasn't, of course. And there is no basis upon which to conclude that the district court's findings on this point were clearly erroneous.

According to Trooper Tilford, Smart's responses to his intended destination *were* inconsistent. Moreover, Trooper Tilford's suspicions in this regard were not based *solely* upon Smart's differing responses as to his purported destination. It was also because Smart "was unable to answer questions as to his travel itinerary," "required long pauses in his sentences," and "stared at the windshield." J.A. 403. For his part, Smart did not argue that his responses as to his intended destination were consistent at the suppression hearing. On the contrary, his testimony corroborated Trooper Tilford's testimony and the inferences he drew from Smart's behavior and responses. Smart testified that he "just made something up," and he could no longer "remember where I said I was going." J.A. 168. According to Smart, "I just wanted to tell him something just because I didn't want to talk to him. I

31

wanted to tell him to mind his damn business." J.A. 168. He was also high on drugs. Put succinctly, Smart was making up lies on the fly and Trooper Tilford reasonably suspected that this was the case.

This brings me to the gas can, which decidedly tips the scales from Smart being a possibly innocent traveler to a person reasonably suspected to be engaged in drug trafficking activity. Smart was driving a Ford Focus with North Carolina tags on an interstate highway in Louisiana, at 8:50 p.m., with a 5-gallon can of gas (and its fumes) in the front passenger compartment right next to him. He told Trooper Tilford—the second time—that he was traveling from Lake Charles, Louisiana, where he had been visiting family "for a few days," to Edenton, North Carolina—a trip that would have traversed 1195 miles and over 16 hours of driving.

As my colleagues point out, a full gas can inside a vehicle might not have been so suspicious if Smart had been a local resident traveling with a full gas can during the day or early evening hours. But he wasn't. Common sense would lead ordinary people to view it odd to carry a full gas can next to you in the passenger side of the vehicle on a long-distance, interstate trip at night. But Trooper Tilford was not just anyone. He was an experienced drug interdiction officer. And he also knew, based on his law enforcement training and experience, that carrying gas cans is a known indicator of drug trafficking. He had seen gas cans in vehicles in his experience as a drug interdiction officer, and he knew that drug dealers sometimes bring gas with them when they are transporting drugs to avoid having to stop at gas stations and get their return trip over as fast as possible.

32

Smart did not challenge the trooper's testimony that this was a legitimate factor supporting the reasonable suspicion calculus at the suppression hearing. He never disputed Trooper Tilford's testimony, credited by the district court, that carrying extra gas is well-known drug trafficking behavior. *See Johnson,* 599 F.3d at 344 (requiring us to "give due weight to the inferences drawn from th[e] facts by resident judges and local law enforcement officers"). And there is nothing in the record that permits us to reject the trooper's testimony on this point, or the district court's findings as clearly erroneous.

IV.

To conclude, I concur in the majority opinion because the totality of the circumstances, including the reasonable inferences drawn from them, easily supports the district court's factual findings and legal conclusions. Trooper Tilford's decision to prolong the traffic stop to conduct a dog sniff of the car was based on far more than a generalized "hunch" that Smart might be carrying drugs. From the moment Trooper Tilford pulled out into traffic, Smart exhibited evasive and excessively nervous behaviors. He gave inconsistent responses to Trooper Tilford's questions about his travel plans; indeed, he lied about them. Trooper Tilford might not have known it at the time, but Smart was also high on cocaine and Trooper Tilford observed unusual and evasive behaviors that was consistent with Smart's admissions. And Smart was carrying a full, 5-gallon can of gas in the front passenger compartment of his vehicle which, based upon the undisputed evidence presented at the suppression hearing, is a known indicator of drug trafficking.

I am satisfied that Trooper Tilford offered the requisite specific and articulable facts that demonstrate at least "a minimal level of objective justification" for the belief that

33

Smart was transporting drugs. *See Foreman*, 369 F.3d at 781. I also agree with the district court's observation that the trooper acted in an exemplary manner. Based upon his observations and reasonable suspicions, Trooper Tilford took appropriate steps to prevent potential harm to the public, to himself, and to Smart.

WYNN, Circuit Judge, dissenting:

I agree with the majority that there was no Speedy Trial Act Violation. But in my view, Trezith Smart's conspiracy conviction must be vacated because the government relied on evidence obtained from an unconstitutional search of Smart's car. The majority opinion makes critical errors in its analysis—errors that will reverberate far beyond this case—so I respectfully dissent.

When a police officer prolongs a traffic stop, he must have reasonable, articulable suspicion of ongoing criminal behavior. That suspicion must be more than a hunch. And it cannot be based on facts that fail to eliminate a substantial portion of innocent travelers.

By upholding the Louisiana traffic stop, the majority opinion fails to follow those Fourth Amendment tenets. Instead, it defers to a police officer's (apparently unassailable) expertise on innocuous facts to find reasonable suspicion where there is none. What's more, it poses no further questions and applies no further scrutiny even where an officer's conclusions bely common sense. The ultimate result? Little more than a driver's nervousness and the presence of a can of gas now offer open invitations for police officers to invade drivers' privacy.

The test for reasonable suspicion is objective. *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008) ("The lawfulness of a *Terry* stop turns not on the officer's actual state of mind at the time the challenged action was taken, but rather on an objective assessment of the officer's actions." (quotation marks and citations omitted)). In order to support a finding of reasonable suspicion, a police officer must offer "something more than an inchoate and unparticularized suspicion or hunch." *United States v. Miller*, 54 F.4th 219,

35

228 (4th Cir. 2022) (quoting *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997)) (quotation marks omitted). "[S]imply label[ing] a behavior as suspicious" does not "make it so." *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011) (quotation marks omitted). Though each fact "need not '*on its own* eliminate every innocent traveler,'" they "must 'in their totality serve to eliminate a substantial portion of innocent travelers.'" *United States v. Williams*, 808 F.3d 238, 246 (4th Cir. 2015) (quoting *United States v. McCoy*, 513 F.3d 405, 413 (4th Cir. 2008)).

Trooper Tilford relied on three facts to justify prolonging the Louisiana traffic stop in order to conduct a canine drug sniff of Trezith Smart's car: (1) Smart appeared "extremely" nervous, (2) Smart told him "inconsistent" travel plans, and (3) Smart had a gas can in his car. None of these facts support the extension of the stop, either individually or collectively.

Let's start with the nervousness. A driver's nervousness is virtually ubiquitous in our reasonable-suspicion cases. No wonder—"most everyone is nervous when interacting with the police," whether they have done something wrong or not. *United States v. Palmer*, 820 F.3d 640, 652 n.7 (4th Cir. 2016). In light of this simple truth, our Court has repeatedly warned that nervousness "is not a particularly good indicator of criminal activity." *Id.* Otherwise, by permitting too much reliance on a person's nervousness as a basis for reasonable suspicion, we would declare open season for police to search almost anyone's car in a routine traffic stop. Nervousness, then, must be more than *just nervousness*; it must be "unusual, beyond the norm, or evasive." *Miller*, 54 F.4th at 229.

Trooper Tilford described Smart's nervousness as "extreme." J.A. 419. But because that adjective is not some magic talisman conjuring a pass from further scrutiny, we must inquire into the facts that support Tilford's conclusion that Smart's nervousness was, indeed, extreme. Here they are: Tilford described his conversation with Smart as "clunky" and "not flowing" because Smart took long pauses before answering his questions and stared out the windshield. J.A. 114. Tilford also got a "vibe" that Smart might drive off. *Id.*

But "vibes" do not support reasonable suspicion. Nor do the other facts render Smart's nervousness "extreme." For starters, a lack of eye contact and some nerves are well within the range of innocent human behavior during a police encounter. *See United States v. Massenburg*, 654 F.3d 480, 489 (4th Cir. 2011). In view of this, even the majority seems to ascribe little weight to these particular facts—describing Smart's nervousness as providing only "limited support" for a finding of reasonable suspicion. Majority Op. at 18.

Most importantly, Smart's nervousness appears to have subsided as the stop went on. On this point, we have more evidence than just Tilford's testimony; the stop was recorded on the dashboard camera of his patrol car. In the video, we see Tilford pull over Smart's car on the highway, approach Smart's window, speak with him for two minutes, return alone to his patrol car, and then return to speak with Smart again, this time with both men standing in front of Tilford's patrol car. The first part of the video is unclear. Because the camera is situated on Tilford's dashboard, we can't see Smart when he is sitting in his car. Additionally, the audio cuts in and out, so we are largely unable to hear Smart speaking. But when Tilford returns to Smart, he asks Smart to exit his vehicle and stand near the

37

patrol car. At this point, we can see Smart, and the audio cuts back in, so we can hear him too.

Critically, during this part of their encounter—before Tilford decided to prolong the stop and conduct a drug sniff—Smart did not exhibit any sort of nervous behavior. Viewing the evidence in the light most favorable to the government, Smart made eye contact, obeyed the officer's orders, and answered the officer's questions normally without any pauses. In other words, even accepting he may have acted nervously earlier, such nervousness subsided, and Smart no longer exhibited any of the signs that Tilford identified earlier. This shift is highly relevant "because an innocent person's nerves tend to decrease as the traffic stop progresses." *Miller*, 54 F.4th at 229; *see also United States v. Vaughan*, 700 F.3d 705, 711 (4th Cir. 2012) (finding nervousness relevant where it "increased" later in the stop); *United States v. Mason*, 628 F.3d 123, 129 (4th Cir. 2010) (finding nervousness supported reasonable suspicion where it "did not subside, as occurs normally, but became more pronounced as the stop continued").

My concurring colleague would erase this portion of the interaction by arguing that it occurred after Tilford returned alone to his patrol car and told Smart he would let him go, so it was natural for Smart's nervousness to subside. But common sense tells us that an officer's return to his patrol car for *about seven minutes* during a stop would make an individual who was pulled over—let alone an individual with something to hide—*more nervous, not less nervous.* Not to mention that Tilford then demanded that Smart exit his vehicle and step outside to talk. Smart's calm demeanor after these developments destroys any reasonable argument that his initial nervousness gave rise to reasonable suspicion.

38

As such, based on *all* the evidence viewed in the light most favorable to the government, I believe the district court clearly erred in finding that Smart displayed "extreme" nervousness. I am further unconvinced that any nervousness supports Tilford's finding of reasonable suspicion.

Next is Smart's "inconsistent" travel itinerary. Trooper Tilford concluded that Smart's travel plans were inconsistent because "at one point [Smart] advised [that] he was traveling to Biloxi, Mississippi and moments later stated he was trying to get home to North Carolina." J.A. 402.

We can blindly accept Tilford's conclusion that these plans were inconsistent, or we can actually examine them. Here are the facts: Smart was pulled over on I-12 near Hammond, Louisiana. He told Tilford he was driving from Lake Charles, Louisiana, where he had visited family for a few days. Smart had a North Carolina driver's license with an address in Edenton, North Carolina. He was driving a car with a North Carolina license plate. It was 8:50 pm at night. Biloxi was only an hour and a half away; eastern North Carolina was much further. And—a touch of important geography here—Biloxi is on the way to North Carolina from the location of the traffic stop.[1]

---

[1] We "may 'take judicial notice of a Google map . . . as a source whose accuracy cannot reasonably be questioned.'" *United States v. Ruffin*, 814 F. App'x 741, 755 (4th Cir. 2020) (Thacker, J., dissenting) (quoting *Pahls v. Thomas*, 718 F.3d 1210, 1216–17 n.1 (10th Cir. 2013)). As a Google map indicates, the most direct route from Lake Charles, Louisiana, to Edenton, North Carolina, starts along I-12, which turns into I-10. Biloxi sits along that route, just five miles off of I-10.

One conclusion, then, is clear. Even viewing the record in the light most favorable to the government, Smart's statements were not inconsistent.[2] Smart certainly could have been driving immediately to Biloxi, while his ultimate destination lay at home in North Carolina. In fact, that's not just a consistent travel plan—it appears to be a logical one, too, based on the time of night. The fact that this itinerary logically follows is further supported by the fact that Trooper Tilford didn't even mention Smart's travel itinerary or its purported inconsistency at the suppression hearing; we have only a passing statement in Tilford's police report to interpret.[3] Perhaps upon further scrutiny, Tilford realized this fact bore little weight. But regardless of why the government failed to rely on this fact at the suppression hearing, it seems apparent that under our *objective* standard, law enforcement's misunderstanding of geography shouldn't be able to establish reasonable suspicion.

Finally, we turn to the last fact supporting Trooper Tilford's reasonable suspicion. Considering the thin set of facts identified above, one might expect the remaining factor to possess strong indicia of criminal activity that bolsters the reasonable-suspicion determination. What one gets, however, is a gas can.

---

[2] The majority opinion points out that Smart later admitted at his suppression hearing to lying about his travel plans. But we assess reasonable suspicion based on facts available at the time. *See Foster*, 634 F.3d at 249. And regardless, even if Smart lied about his travel plans, that didn't render such plans *inconsistent*.

[3] The government established the fact of Smart's travel plans through Tilford's police report, which would normally be inadmissible hearsay. Although the Rules of Evidence don't apply at suppression hearings, I believe the government's reliance solely on a police report, rather than officer testimony, does raise a question of reliability on the matter. Additionally, because Tilford never actually testified that Smart gave inconsistent travel plans, that appears to explain why Smart—representing himself pro se below—never addressed the issue at the hearing.

40

That's it—the presence of a five-gallon gas can in Smart's car. But according to Trooper Tilford, a gas can is connected to criminal behavior because drug traffickers "will bring gas with them to avoid having to stop at any gas stations to get their return trip as fast as possible." J.A. 113.

The majority opinion readily recognizes this explanation is "puzzling." Majority Op. at 14. I agree. After all, whether or not someone keeps a gas can in their car, they still have to stop to fill their car with gas. Additionally, five extra gallons of gas only gets a person so far on a long trip. And it seems that filling up a car on the side of the road, rather than at a gas station, might draw *more* police attention, not less. So this explanation is puzzling, to say the least.

Of course, some weight is due to the expertise of law enforcement, who have a different vantage point than courts do and may spot suspicious behavior where we do not. *See United States v. Foreman*, 369 F.3d 776, 782 (4th Cir. 2004). But that expertise can't go unquestioned, particularly where an officer's explanation of why a behavior is suspicious is as unsatisfying as what we find here. In such a case, when police rely on an item as innocuous as a gas can, we can and should expect more. *Williams*, 808 F.3d at 246 (requiring officers to explain why unremarkable "behavior is likely to be indicative of some more sinister activity than may appear at first glance" (quoting *Foster*, 634 F.3d at 248)). Moreover, "it is not a heavy burden for courts to demand such an explanation from officers who, as in this case, testify as to *both* the underlying, objective facts *as well as* the significance of those facts." *United States v. Drakeford*, 992 F.3d 255, 267 (4th Cir. 2021) (Wynn, J., concurring). Here, we simply don't have that. And the fact that Smart may not

41

have been clearly on his way to "fill up [his] lawnmower" doesn't remove the presence of a gas can in his car from the realm of innocent behavior. Majority Op. at 13. Thus, the presence of the gas can does not tilt the scales here.

In sum, none of these facts individually support a finding of reasonable suspicion. Nor do they do so in their totality. Instead, it appears that Tilford decided to extend the stop on little more than a generalized hunch that some crime was afoot. That's not enough. Thus, Tilford's prolongation of the traffic stop violated the Fourth Amendment, and I cannot conclude that any error was harmless as to Smart's conspiracy conviction. After all, the 5 kilograms of cocaine that were recovered from the stop played a critical role in the ultimate conspiracy conviction (the jury having found Smart responsible for that amount). I would reverse the district court's denial of the motion to suppress and vacate that conviction.

The reach of the majority's error on this point is troubling. By upholding Tilford's hunches without further scrutiny, the majority opinion insulates police officers from the imperative to offer constitutionally sufficient rationales for their decisions. The majority assures us that "[o]ur detached perspective does not mean that we may *never* second guess officers or district courts." Majority Op. at 14. But this is shallow comfort.

After today, all an officer has to do is describe a driver's nervousness as "extreme" and give one or two otherwise innocent facts a nefarious gloss and, *voila*, reasonable suspicion. Police officers' opinions cannot be unassailable. Otherwise, we undermine the protections of the Fourth Amendment for every traveler on the road. With respect for my good colleagues in the majority, I must dissent.

42